**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| ANGELA M. GREENE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 1:19-cv-00269-JPM-CHS |
| v. | ) | |
| | ) | |
| GLORIA GROSS, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER DENYING MOTION PURSUANT TO 28 U.S.C. § 2254,**
**DENYING A CERTIFICATE OF APPEALABILITY,**
**CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH,**
**AND**
**DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

On Sunday, November 9, 2009, police officers responding to a 911 call from Petitioner found Robert "Bob" Gravely ("the victim"), a seventy-year-old man with whom Petitioner had occasionally resided during at least the previous year, lying in his front yard with serious injuries. *State v. Greene*, No. E2013-00475-CCA-R3-CD, 2014 WL 3384661, at *1 (Tenn. Crim. App. July 10, 2014), *perm. app. denied* (Tenn. Dec. 17, 2014) ("*Greene I*"); *Greene v. State*, No. E2017-02257-CCA-R3-PC, 2019 WL 1077308, at *1 (Tenn. Crim. App. Mar. 7, 2019), *perm. app. denied* (Tenn. June 20, 2019) ("*Greene II*"). Police took the victim to the hospital, where he initially declined to fully explain the circumstances that led to his injuries. *Greene II*, at *1. After the victim realized he was dying, however, he gave a statement indicating that on the Friday or Saturday night before police found him, he had refused to allow Petitioner and her boyfriend, Ricky Bryson, to take his car, at which point Petitioner and Mr. Bryson assaulted him and poured

1

liquid on him before leaving his residence in his car while he was lying on the ground in his yard. *Greene I*, at \*4. Two days after giving this statement, the victim died due to complications of his injuries from this incident. *Id.*

Based on evidence relating to this incident, a jury convicted Petitioner of first-degree murder in the perpetration of theft, aggravated assault, and theft of property valued at more than $1,000 but less than $10,000, and the trial court sentenced her to an effective sentence of life. *Id.* at \*1. Petitioner, a state prisoner, has filed a pro se petition for habeas corpus relief pursuant to 28 U.S.C. § 2254, challenging these convictions by claiming that the evidence was insufficient to support them, that the trial court's admission of the victim's statement implicating her was improper, and that her trial counsel provided ineffective assistance. (ECF No. 14.) Respondent filed a response in opposition to the petition (ECF No. 20) and the state court record (ECF No. 18). Petitioner did not file a reply, and her time for doing so has passed. (ECF No. 9 at PageID 75.)

After reviewing the Parties' filings and the state court record, the Court finds that (1) the evidence was sufficient to support Petitioner's convictions; (2) Petitioner procedurally defaulted any claim that admission of the victim's dying declaration violated her constitutional rights, and her claim that admission of this statement violated state law is not cognizable herein; and (3) Petitioner has not established that her trial counsel was ineffective. Thus, Petitioner is not entitled to relief under § 2254, no evidentiary hearing is warranted, *see* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007), the habeas corpus petition will be **DENIED**, and this action will be **DISMISSED**.

## I.    BACKGROUND

The Tennessee Court of Criminal Appeals ("TCCA") summarized the evidence presented at Petitioner's state court criminal trial as follows:

This case relates to an assault of Robert Gravely, . . . and the theft of his car. At the trial, Calhoun Police Chief Larry Moses testified that in 2009, he was Etowah Police Department's only detective. He said the police talked to the victim "quite often" when the victim's car was missing. He recalled three or four occasions on which the victim made complaints of this nature. He said he talked to the victim four or five times at the police station and on the telephone. He said, "He would come and complain and then the car would show back up and [the victim] would forgive and then the car would come missing again and the car would show back up and he would forgive, and it kind of went like that."

Chief Moses testified that the victim owned two or three acres, most of which was wooded. He said that in the summer, the house could not be seen from the road. He said the victim's mailbox sat by the house's front steps and was not visible from the road. He said that following the dirt or gravel driveway, the house was seventy-five to 100 yards from Athens Pike but that the distance was not as far "as the crow flies." He later said the house was at least 150 yards from Athens Pike.

Chief Moses testified that [Petitioner] lived at the victim's house "at least part of the time." He did not know for how long before the victim's death she lived there but said he was aware of her living there for about a year.

Chief Moses testified that the victim was unique because if he liked a person, he would talk to the person, but if he did not talk to a person, he "would have very little to do with" the person. He said the victim said what was on his mind but would not always provide more conversation, even if the other person wanted it.

Relative to the events in this case, Chief Moses testified that he received a call on a Sunday morning from Sergeant Eric Armstrong, who told him the victim had been found lying in the yard. He said that he went to the victim's house within six or seven minutes and that the victim had been taken away by ambulance by the time he arrived. He said that Sergeant Armstrong, Chad Bogle, [Petitioner], and Ricky Bryson were present and that he later called Lieutenant Danny Jones to the scene. He said Ellen McCleary came to the scene, but he did not remember the time. He said that when they spoke by telephone, he told Sergeant Armstrong to separate [Petitioner] and Mr. Bryson because they were material witnesses regarding who found the victim. Referring to photographs, he described the victim's property. He identified a bench consisting of a piece of concrete about four feet long sitting on brick stanchions. He said the bench was broken.

Chief Moses testified that Sergeant Armstrong and Mr. Bogle told him the victim was "not in good shape, was extremely cold, was bruised, and [was] bleeding." He said the air temperature was in the high 20s to low 30s around 8:00 to 9:00 a.m.

Chief Moses testified that after speaking with [Petitioner], he and other officers went into the victim's house and listened to the victim's answering machine messages. He said there were over forty messages on the machine and agreed they dated from

3

the time the victim began using the machine. He said [Petitioner] told him she left messages for the victim before she found the injured victim. Five messages were played for the jury. The first message was from a government agency. The second message stated, "Hey, Grav, I was just checking on you this morning. Call me when you wake up. Bye." The date and time stamp indicated it was received "Monday, 8:12 a.m." The third message was from a government agency. The fourth message, left "Tuesday, 1:13 a.m.," stated, "Grav, are you there? Are you awake? Are you alive? Pick up that phone." The fifth message, left "Tuesday, 2:04 a.m.," stated, "Hey, Baby, it's me. I was just going to tell you I was dropping my daughter off for something to drink here (inaudible) you know, on 9th Street, and I will be straight on in though. I will see you in a few minutes. Bye." Chief Moses said the time stamp on the machine was incorrect. He said [Petitioner] acknowledged leaving the message asking if the victim was alive.

Chief Moses testified that the officers collected a red-checked shirt, a Faygo can from the yard, and [Petitioner]'s clothes. He said they collected "clothes and various things" from the victim, although the victim had been taken away by ambulance. He identified the victim's shoe they collected, which had been in the location where the victim had lain. He identified a light aluminum cane that he collected three or four days later, when he went to the scene to look for the victim's other shoe. He identified photographs taken at the scene. He said one photograph depicted the victim's left shoe, which he found near the broken bench a few days after the right shoe was recovered. He said the Faygo can was found in the same area. He said it appeared an altercation occurred in the area. He identified photographs of a blanket, a shoe, and a shirt found in the area near the house where the victim had lain. He said the bench was about fifty-five feet from the steps. He said that the second shoe was about forty feet from the house and fifteen feet from the bench and that the cane was within two feet of the bench. He said the victim's car was on the circular driveway in front of and just past the house, about fifteen to thirty feet from where the victim had lain. He identified a photograph of [Petitioner] taken on the day the victim was found and one of a dent in the top of the victim's car's hood. He said that both [Petitioner] and Mr. Bryson had blood on their clothes and that he saw blood on Mr. Bryson's hands. He said [Petitioner] and Mr. Bryson called 9–1–1 and said they had tried to render aid to the victim.

Chief Moses identified photographs of the interior of the victim's house depicting [Petitioner]'s bedroom. He said he understood that although the victim had a bedroom, he usually slept on the living room couch. He identified photographs of Mr. Bryson, Mr. Bryson's tattoo, and Mr. Bryson's shoes. He identified a document found on the front porch that listed furniture and dollar amounts. He stated that some of the document was in Chief Moses's handwriting but that it also contained an unknown person's writing. He said, though, that some of the items listed were not on the front porch. He identified photographs of [Petitioner], her hands, the dent in the victim's car, "driveway marks" on a road, and an unlocked padlock on a basement door. He said that he had seen the victim's car before the day the victim was found lying in the yard and that he had never noticed a dent in the car.

Chief Moses testified that the victim's car was towed to a police impound facility. He said he and Lieutenant Jones inventoried the car later. He said that when he had been at the scene, he told [Petitioner] she could not take the victim's car and that she was "[n]ot happy at all." He agreed she "made a scene" with "arm fraying [sic]" and left on foot with Mr. Bryson. He said that after two to three hours at the scene, he went to the University of Tennessee (UT) Medical Center to see the victim. He identified photographs of the victim taken on the day the victim was admitted to the hospital. He said the victim was covered with "bubble blankets" attached to a heating device to raise the victim's core body temperature. He noted bruising and discoloration on the victim's right hand, lower left leg, left torso, right side from his armpit to his knee, left forearm, left hand, right eyelid, back, and stomach. He said that if the victim had the discoloration previously, he would have noticed it. He said that the victim had scratches and that some of his injuries resembled burns. He stated that marks on the victim's left stomach and left forearm appeared to be from a shoe or boot.

Chief Moses testified that on the day the victim was taken to the hospital, the victim was "in and out of" consciousness and was in "pretty bad shape." He said the victim appeared to be in pain and was sedated. He said that the victim made statements over time but that the victim said what he wanted to say, rolled his head, and would not say more. He said the victim initially stated that he was not ready to talk about what happened and later said he was unsure. He said he was concerned about pressing the victim too much and angering him. He said that sometimes when he asked the victim what happened, the victim looked at him, closed his lips, and rolled over. He said the victim stated, "I'm trying to figure if it was an accident or not." He thought he talked to the victim five or six times before the victim died. He said that on some occasions, a family member called and told him the victim was "more at himself" or more comfortable. He said he had trouble determining whether the victim was sedated or did not want to talk. He said that at one point, the victim told him that [Petitioner] and Mr. Bryson hurt him but that he did not know how. He said that although the victim never told him he was afraid, he knew the victim was afraid and was moved at the hospital three or four times.

Chief Moses testified that he learned that Scott Cass, a deacon at the victim's church, thought the victim might talk to him. He said that they visited the victim together twice and that the victim opened up more. He said that before Mr. Cass and he visited the victim, the victim had already told him that [Petitioner] and Mr. Bryson were responsible. He said the victim never wavered from this assertion. He said, though, "[The victim] had a resolute way of saying this is what it is, and if he couldn't say this is exactly what it is he would rather not say anything at all." He said that in his earlier meetings with the victim, the victim "was still trying to figure out exactly what happened."

Regarding his last meeting with the victim, Chief Moses testified that Ellen McCleary called him and told him the victim was ready to talk. Chief Moses asked

Mr. Cass to meet him at the hospital. He said the interview took place about thirty-one days after the victim's first statement on the day he was admitted to the hospital. Chief Moses took one of the police department's new video cameras, which he had never used. Although he attempted to record the conversation, the camera did not operate properly, and no recording was made. He said that Mr. Cass held the camera and that he saw the camera was in "play record" mode. He said the victim greeted him and thanked him for being "good" to him. He said the victim stated, "Larry, I'm not leaving here. You know it and I know it." He said the victim also stated, "I'm not long for this world," and said he would not leave the hospital alive. He asked the victim for an account of the events that led to his injuries.

Chief Moses testified that the victim gave the following statement: [Petitioner] and Mr. Bryson had been in the victim's car, came to the victim's house, and intended to leave in the car. The victim was upset that they had used his car and did not intend to let them leave in it again. He knew [Petitioner] and Mr. Bryson were using drugs when they were gone in his car and did not like it. An argument began inside and continued outside, where there was a "tussle." Mr. Bryson knocked down the victim and "kicked [him] in the balls." [Petitioner] kicked him, as well. The victim could not get up. [Petitioner] said, "Your car won't do you any good now you old bastard," and [Petitioner] and Mr. Bryson left in the car. The victim repeated that he wanted to tell the truth because he would not leave the hospital alive.

Chief Moses testified that in one of the visits he and Mr. Cass had with the victim, the victim stated that [Petitioner] and Mr. Bryson "left and returned and left again." He did not recall if the victim said this during the final visit. He said the victim thought he was outside from Friday night when the fight occurred until Sunday morning. He recalled the victim's stating that the fight occurred on Friday night. He said it was likely the victim could not be seen from Athens Pike during this time. He said the victim stated that the tussle occurred next to the bench. He said that when he first talked to the victim after his hospital admission, the victim said, "The grass, the leaves were burning me, the leaves were burning me," which in hindsight he thought was the victim's description of hypothermia or frostbite. He said the victim died two days after the final statement. He said that in the earlier statements, the victim was unsure when questioned about specific things but did not express uncertainty in the last statement. He said the victim wanted to get the facts straight first and ensure he told the truth. He thought the truth was important to the victim. He said that on the day of the final statement, the victim was as lucid as he had seen him. He said the victim was alert and awake, was not drowsy, and did not appear to be under the influence or not know what he was doing. He said the victim sat up straighter in the bed than he had previously. He saw bandages on the victim's arms and hands.

Chief Moses testified that he thought the final interview had been video recorded. He said he did not discover until the preliminary hearing that no recording had been made. He said he took the camera and disk to the Tennessee Bureau of Investigation (TBI) Headquarters to determine if the recording could be recovered. He said the

TBI informed him that although there was evidence that an attempt to record was made on the date of the victim's final statement, no recording was made. He said that he had not taken notes because he thought the interview was being recorded but that he had notes from the "snippets" of information the victim gave previously.

On cross-examination, Chief Moses acknowledged that he had been fond of the victim and had known him from the victim's three to five complaints about his missing car before November 2009. He said that he had seen [Petitioner] driving the victim's car alone and that other officers told him they had seen [Petitioner] and the victim in the car together after the victim complained about his car's absence. He agreed that the victim had never married and had lived in the same house, which had been his parents', for most of his life. He agreed that [Petitioner] lived at the victim's house "off and on" for about a year. He said [Petitioner] identified the bedroom with the answering machine as the one in which she slept.

Chief Moses testified that on November 9, 2009, an ambulance responded to the scene first. He agreed the victim's shirt was left behind when the victim was taken from the scene and said medical personnel often cut off a patient's clothes. He did not know if the victim was conscious when the emergency medical personnel arrived. He agreed [Petitioner] called 9–1–1 but did not remember if the recording reflected that she spoke to the victim during the call. He did not know the victim's position when the first responders arrived but said it was to the right of the house's steps. He agreed the mailbox was near the front of the house. He agreed the shoe found near the front of the house had the heel dented, as if it had been worn without the foot completely inside the shoe. He agreed the walking cane was found near the broken bench, not the location the victim had been. He agreed that the first shoe was found near the house on November 9 and that the second was found seventy-eight feet from the front of the house on November 16. He said the bench looked freshly broken but acknowledged he had not been to the victim's house previously. He said that before November 9, the victim had sometimes used a cane. He said the victim walked to the police station once. He said sometimes the victim walked well but most of the time he did not. He did not know anything about the victim's medical condition. He said the victim was "[a] pretty good size fellow." He agreed that Mr. Bogle, Sergeant Armstrong, and the emergency medical responders speculated that the victim might have been beaten, hit by a car, or burned with a chemical.

Chief Moses testified that he did not know if an officer moved the victim's car before he arrived or if the dent existed "at the time of this event." He agreed he inventoried the car's contents and found items belonging to the victim, [Petitioner], and Mr. Bryson. He agreed that he determined that the car needed investigating and that neither he nor the other officers offered [Petitioner] and Mr. Bryson a ride. He said he was surprised at the extent to which [Petitioner] was upset. Although he did not remember his exact words, he said that he told [Petitioner] that the car was part of the scene and that it would not be leaving the scene.

Chief Moses acknowledged that the victim was unsure whether the tussle occurred on Friday night or Saturday. He agreed the victim's mailbox was close to the house in order for the victim to have an easier walk to the mailbox. He agreed that if mail had been delivered on Saturday, the mailman would have seen the victim. He agreed that making the 9–1–1 call was important to saving the victim's life and that if the 9–1–1 call had not happened on Sunday morning, the victim would not have been found for another day or longer. He said the police saw the broken bench on November 9, 2009, but did not see the cane and shoe near it until later. He said that the bench was fifty-five feet from the front steps and that the victim had been four to six feet from the steps. He said that the concrete block was in the center of the driveway near the bench and that he could not determine why it was there.

Chief Moses testified that his theory of the case was that the victim crawled or scooted toward the house from the area near the bench where an assault occurred. He noted injuries on the victim's hands, elbows, forearms, tops of his feet, and stomach that he said were consistent with his theory. He acknowledged that he did not know the extent of the victim's medical concerns aside from his injuries and said he never spoke with the victim's physicians at length. He agreed that the victim was hospitalized for thirty-three days before his death and that he was moved to different hospital locations due to his medical condition.

Chief Moses acknowledged a document he created regarding his November 12, 2009 hospital visit with the victim. He said he was asked to come to the hospital by Margaret Pickett, a family friend of the victim who stayed with the victim at the hospital, or Ellen McCleary, but he did not recall if either woman was present that day. He said his hospital visits were typically prompted by Ms. Pickett's or Ms. McCleary's telling him the victim was better that day. He identified documents he created regarding his November 14 hospital visit with the victim, a November 15 conversation with the victim, and a shoe, a cane, and a can he found at the victim's property on November 16. He said that at the time of the trial, he had not been employed with the Etowah Police Department for sixteen to eighteen months, did not have access to his case file, and was testifying from memory. He acknowledged that the victim's sister, Melea Gravely, had a health care power of attorney for the victim. He agreed that the victim's answering machine contained additional messages that were not played earlier in the trial and that some of the messages were from [Petitioner].

Chief Moses testified that he had specialized training in methamphetamine detection. He agreed that when he inventoried the victim's car, it contained no components of methamphetamine manufacture or evidence of methamphetamine use. He agreed he saw no evidence of methamphetamine manufacture in the victim's house and did not notice an odor associated with methamphetamine manufacture. He said he searched the victim's basement and found no evidence of methamphetamine manufacture. He was not aware of the victim's having allowed [Petitioner] to be listed on his auto insurance policy as a driver of his Taurus.

8

On redirect examination, Chief Moses identified the car inventory list, which was received as an exhibit. He said that bricks, sticks, and rocks were in the victim's yard and that he did not know when he investigated the scene how the items related to the victim's injuries. He said that before his final interview with the victim, the victim never stated he thought he would die or would not leave the hospital alive.

Regarding the victim's statement on November 15, 2009, Chief Moses testified that the victim stated that after the tussle, [Petitioner] "left around 9:00 and came back around 11:00" and that he thought he was outside for "most of the night." He said the victim stated that he fought with [Petitioner] and Mr. Bryson when [Petitioner] wanted to leave to get "more dope." The victim stated that [Petitioner] and Mr. Bryson beat him, threw an unknown liquid from the car on him, and left him lying on the ground. The victim stated that [Petitioner] told him the car would not do him any good.

Regarding a statement the victim gave on a date not identified by counsel or the witness, Chief Moses testified that the victim stated that [Petitioner] told him she was going to take his car. The victim said [Petitioner] had threatened previously to hit him with his cane. Chief Moses agreed that in one of the statements, the victim said [Petitioner] stated that the car would not do the victim any good. He agreed that the victim told him [Petitioner] and Mr. Bryson kicked him in the testicles and left in a car other than his. He thought that the car was gold and agreed that he did not know whether [Petitioner] was "in the place." He said the victim's testicles were "black," bruised, and six to ten times larger than they should have been. He compared their size to a grapefruit.

TBI Special Agent Douglas Williams, an expert in computer evidence retrieval, testified that he examined a video recorder and disk related to the case. He said that his examination of the disk and recorder revealed "finalization" of a recording but that the file that should have contained the data was empty. He said this meant the operator failed to press the record button, the recorder "timed out" and did not permit recording, or "the device just failed." He agreed a recording was never made, not that a recording was destroyed.

On cross-examination, Agent Williams testified that there was no way to know if the disk had been in the recorder on the relevant date. He said he did not examine the recorder to determine whether he could replicate the failure or make it work properly.

Emergency Medical Technician Kevin Elliott testified that he responded to a call for assistance for a person who had fallen on November 9, 2009, around 7:30 or 8:00 a.m. He said that he knew the victim previously and that when he arrived, the victim was lying on the ground, covered with a blanket. He stated that the victim's torso was covered in bruises, that his pants had burn holes, that he did not talk but made a chewing motion, and that his skin was cool. The victim was not responsive but was able to move and was conscious. He agreed the victim was in "pretty bad

9

shape." He said that the weather was "chilly" that morning, that it had been cold the previous night, and that he would not be surprised if the victim had frostbite. He agreed he did not see many frostbite injuries. He said the victim was taken by helicopter to UT. He said he told the police officers the victim had been assaulted. He said the victim's injuries were inconsistent with a fall. He thought he cut off the victim's shirt and gave it to an officer and said he cut the victim's pants to the thigh but did not remove them. He identified a shirt as the one he removed from the victim. He agreed the victim's clothes and body were covered in dirt and leaves.

On cross-examination, Mr. Elliott testified that the ambulance company had changed since November 9, 2009, and that he did not have any documentation relative to the call. He said he had been trained relative to hypothermia and frostbite but had never seen a patient with the conditions in twelve years on the job. He said a private car and two police cars were at the scene and did not know if any cars were moved before he arrived. He said that to his knowledge, the victim's pants went to UT with the victim. He said that based upon the amount of dirt on the victim, it appeared the victim had been in the yard and exposed to the elements for more than a few minutes. He agreed it took more than a few minutes to develop hypothermia or frostbite. He said frostbite caused skin discoloration and in its early stages, looked like bruising.

On redirect examination, Mr. Elliott testified that the victim's pants had "burnt melted fabric" and did not look cut or ripped. He said it looked as if the victim had been hit by a car and burned by the muffler. He noted that the victim's skin below the burned pants was melted and "slipping." He said the pants holes were on the inner shins and up the thigh and knee area. He said the victim's testicles were not exposed.

On recross-examination, Mr. Elliott testified that he did not know the victim's medications and said that would have been recorded in the unavailable documentation. He said that a person taking Coumadin might bruise if he hit or bumped into something but that the victim's injuries were more extensive. He did not know if a person taking Coumadin would have the victim's injuries from frostbite and hypothermia.

Etowah Police Chief Eric Armstrong testified that he was a patrol sergeant in 2009 and that he was the first officer on the scene where the victim was found. He said the paramedics arrived about one minute later. He said a car was parked facing west toward Athens in the circular driveway, at least fifty feet from the victim. He said [Petitioner] and Mr. Bryson were present. He said [Petitioner] was near the victim, speaking to him. He thought Mr. Bryson was not near the victim but said he did not pay much attention to Mr. Bryson.

Chief Armstrong testified that the victim lay on his back under a blanket. He said he had never seen injuries like the victim's. He said the victim had a dark purple square in his chest and bleeding cuts on his legs. He thought the victim had fallen. He said the victim was dirty and wore one shoe. He said he went into the victim's

house after he called then-Detective Moses. He said Lieutenant Jones helped process the scene.

On cross-examination, Chief Armstrong testified that he had seen people who had been hit by a car or involved in a motorcycle wreck. He thought the victim's chest injury could have been a severe internal injury. He said he had not previously seen frostbite. He said he did not look for the victim's second shoe that day. He said that leaves were on the ground at the scene and that the driveway was gravel.

Chief Armstrong testified that he had seen [Petitioner] driving the victim's car but did not think he had seen the victim in the car with [Petitioner]. He recalled a traffic stop in which the victim was not in the car when another officer stopped [Petitioner]. He said that he had seen the victim walking with a cane on Athens Pike and had been to a call about a prowler at the victim's house but that he did not really know the victim before the relevant events.

On redirect examination, Chief Armstrong testified that he remembered the call about the prowler at the victim's house because another officer who had been to the victim's house previously cautioned him to identify himself quickly because the victim had weapons and might be on the porch. He agreed he had not seen discoloration on the victim's hands before the day he saw the victim lying on the ground.

Margaret Ellen McCleary testified that she had known the victim all her life and that the victim and her father had been friends. She described the victim as a "loner" and said he "took up with" her mother, her cousin, and her after her father died. She said the victim was socially "awkward and backward." She said he had lived with his mother until her death. She said he kept his home very clean. She said he was unskilled at conversation, although he made a statement if he had something to say and answered questions. She said that if he visited someone's house, he stood with his hand in his pocket and looked down. She said he had "Parkinson on his thumb." She said that despite his lack of social skills, the victim was helpful to others and "had a very big heart." She said the victim had never been in trouble. She said that he was well-liked and that he sang in his church's choir. She said the victim helped set her father's gravestone and put grass seed and straw over the grave.

Ms. McCleary testified that before the victim met [Petitioner], he came to Ms. McCleary's mother's house almost daily. She said that after they met, the visits stopped. She described the victim as "OCD." She said he ordered cases of soap and took five to six showers daily. She said he would shower in the middle of the night if he felt sweaty. She said he always wore bleached white t-shirts and groomed his hair neatly. She said that after the victim stopped visiting her mother's house, she saw him walking to town with disheveled hair and dingy t-shirts. She said he appeared to have lost weight. She said that "something very wrong" was happening but that she did not know what. She said this took place during "several months"

before his death. She estimated that the [victim] attended Zion Hill Baptist Church for more than twenty years.

Ms. McCleary testified that she had known [Petitioner] in high school. She said that other than at a funeral, she had not seen [Petitioner] since high school until she saw her with the victim. She stated that she saw [Petitioner] in a car at a gas station, that the victim was inside playing the lottery, and that she asked [Petitioner], "What are you doing with him, what is he doing with you?" She said she was concerned because she knew [Petitioner] used drugs. She said [Petitioner] was "zipped up" and was jerking. She said she tried to talk to the victim about [Petitioner] three or four weeks before the events of this case.

Ms. McCleary testified that the [victim] had investments and money. She said he always insisted on paying when he took her family and her to lunch. She said he was self-sufficient and would not accept help. She said, though, that the victim's finances changed, that he mortgaged his house, and that he bounced checks. She said that at an antique shop, she found the victim's mother's possessions, hundreds of the victim's family's photographs, and six or seven quilts made by the victim's mother. She said the store's owner told her that many other quilts from the victim's house had already been sold. She said that she had seen the victim's mother's clothes stored in a chest of drawers at the victim's house. She said that the attic had been orderly for twenty to thirty years after the victim's mother died but that when the victim died, the attic had been ransacked and any items of value had been removed. She said that when the victim's brother helped the victim remodel the house and bought furniture for the victim, antique furniture that had been the victim's mother's remained in two bedrooms and the dining room. She said the victim had never talked about selling the antiques. Regarding the list of furniture and dollar amounts previously received as an exhibit, she said that a mattress and box springs were left in the house. She said that the victim's brother had bought two sets of mattresses and box springs for antique beds in the house and that the set in the victim's mother's bedroom had not been slept on. She said that an antique armoire, dresser, mirror, and night stand had been in the front bedroom. She said that a new couch, love seat, coffee tables, and end tables had been purchased by the victim's brother.

Ms. McCleary testified that she heard something bad happened to the victim and went to his house on the Sunday morning he was found in the yard. She said that when then-Detective Moses told [Petitioner] she could not take the victim's car, [Petitioner] was "furious" and "absolutely livid." She said [Petitioner] walked away, turned around, "flipped a 'bird,' "and said "'F' you[.]" Ms. McCleary did not think she went into the victim's house on November 9, 2009.

Ms. McCleary testified that the victim's father made the stone bench in the front yard. She said it had been in the yard all her life. She said the bench was not broken three weeks before November 9, 2009, when she talked to the victim. She said the

12

victim was sentimental about the bench because his father made it. She was surprised to see the bench was broken on November 9.

Ms. McCleary testified that she and her mother, Margaret Pickett, alternated days staying with the victim at the hospital. She described him as being in "severe critical condition" when he was taken to the hospital. She said he was in pain until his death. She photographed his injuries. She said that the victim had been "stomped between the legs" and that his scrotum was larger than a cantaloupe, swollen to the point it seeped fluid, and black and purple. She said the victim screamed in pain when his legs touched his scrotum. She identified a photograph of the victim's genital area. She said the victim's "burns or frostbite" wounds were debrided twice a day by scraping the skin "down to the blood," applying ointment, and wrapping in bandages. She said that the victim was given strong pain medication before the wounds were debrided but that it did not alleviate his pain. She said he was "so miserable and hurt so bad." She thought the victim was in seven hospital rooms and said he was "petrified." She said the victim watched the door and told her he was afraid [Petitioner] and Mr. Bryson were going to find him and "finish the job."

Ms. McCleary testified that the victim asked her to call then-Detective Moses because he wanted to talk. She said Moses came the next day when her mother was at the hospital. She said that the victim was always physically unwell at the hospital but that "a couple of days his mind was very lucid." She said the victim was able to tell her his siblings' full names, their birth dates, his full name, and how he was named after a preacher.

Regarding the time of the victim's death, Ms. McCleary testified that the victim was mostly unresponsive. She said he reacted to her voice but was unable to stay awake. She said a doctor took her, the victim's niece, and his great niece into another room and told them the medical staff had done everything they could for the victim and were going to try to make him comfortable. She said she called the victim's family members to come to the hospital to say goodbye.

On cross-examination, Ms. McCleary testified that she knew [Petitioner] stayed at the victim's house. She agreed she had seen them out together several times. Regarding his medical history, she said the seventy-year-old victim had a defibrillator, had Parkinson's Disease, and had been "in and out" of hospitals. She said that her parents had helped the victim with transportation to medical appointments but that the victim sometimes drove himself. She said the incident when she saw [Petitioner] and the victim at a convenience store was three to four weeks before November 9, 2009. She said [Petitioner] had been driving. She agreed she was upset and said she knew [Petitioner] was "on something" that day. She disagreed that [Petitioner] helped the victim by shopping for groceries and personal items. She said she saw the victim walking to and from a grocery store several times after [Petitioner] began staying with him. She said the victim's independent nature was such that she could not see his ever allowing someone to be his caregiver. She agreed she thought [Petitioner] took advantage of the victim and said the victim

13

received Social Security payments, had investment income, and owned his house. Regarding her opinion of [Petitioner], she said, "[A]nyone could pick up a police blotter and know what kind of lifestyle she lives."

Ms. McCleary testified that the victim had already been taken away when she arrived at his house on November 9, 2009. She said that [Petitioner] was "furious," that [Petitioner] came to her car, that she asked [Petitioner] what happened to the victim, that [Petitioner] had two pairs of shoes and flopped them on the hood of her car, that [Petitioner] started "ranting and raving," and that [Petitioner] said the victim had been run over by a car. She said that based upon the distance to the road, it was impossible for the victim to have been run over. She said then-Detective Moses told [Petitioner] she needed to leave.

Ms. McCleary testified that she never saw the victim with a cane. She said that he had no problem with balance and that he walked well. She said the victim's sister, "Melea," had a health care power of attorney for the victim for a previous hospitalization but did not know if Melea still had one after the victim was injured. She said she was not present when then-Detective Moses tried to record a statement from the victim.

Dr. Darinka Mileusnic–Polchan, a forensic pathologist, testified that the victim died on December 11, 2009, from sepsis, cold exposure, and assault. She said the manner of death was homicide. She said his skin ulcers from his frostbite injuries became infected and caused the septic illness. She said the victim's injuries were consistent with blunt force trauma and frostbite. She said he had necrosis, which was dying tissue. She said injuries like the victim's might appear to have been a chemical burn to someone who did not deal with frostbite regularly. She said injuries on the victim's hand appeared to be defensive in nature. She said a contusion to the victim's side was "massive blunt force trauma" and could have been caused by his being kicked. She said injuries to the victim's abdomen could have been caused by crawling over rocks, leaves, and twigs. She said that areas of the body over bone, such as the elbow, knee, and hip were often more affected by frostbite. She noted the victim's frostbite on his knees and legs. She said that the frostbite wounds on his shins and knees were deep and became infected. She noted blunt force trauma to the victim's left abdomen and right chest. She said that the injury to the left abdomen was marked as a footprint but that she had to rely on the person who observed the injuries and took a photograph to determine whether it was a footprint. She noted blistering in a photograph of the victim's right arm, which she said was characteristic of "very acute" frostbite and could cause misinterpretation as a chemical burn. She was unsure whether frostbite was depicted in a photograph of the victim's left hand.

Dr. Mileusnic–Polchan testified that she could not determine from a photograph the cause of the victim's swollen scrotum. She did not see evidence of frostbite and said the swelling might be from a combination of trauma and medical treatment.

Dr. Mileusnic–Polchan testified that the victim's bruises could have come from a fall from a significant height, such as down a ten—to fifteen-foot stairwell. She said a fall down the victim's front porch stairs would not have caused the injuries.

Dr. Mileusnic–Polchan testified that the victim's frostbite extended to his muscles. She said frostbite injuries became deeper after longer exposure. She said his ability to recover from infection was compromised by his other medical conditions, which included heart disease, hypertrophic car[di]omyopathy, arteriosclerotic disease, chronic obstructive pulmonary disease, and the trauma and frostbite from the relevant events. She said he had a pacemaker. She said that infection sometimes happened in a hospital setting and that "it's really nobody's fault." She said the victim was sixty-six inches tall and weighed 232 pounds.

Dr. Mileusnic–Polchan testified that the time for development of frostbite varied based upon several factors, including the temperature, the position of the body, the location of the body, and the condition of the person. She said that "any late through the night temperature, early morning temperature" was conducive to frostbite, particularly if the person was on the ground.

On cross-examination, Dr. Mileusnic–Polchan testified that she received information that the victim and his caretaker had a dispute over the victim's car, that the caretaker's friends injured the victim, and that the victim was left in his yard overnight. She thought she reviewed a video recorded statement from the victim, but she was unsure. She said she would have reviewed the victim's medical records that were available at UT Medical Center at the time of his death. She agreed that in addition to the medical conditions about which she testified previously, the victim had Parkinson's Disease, which she acknowledged could cause tremor, affect motor skills, and affect balance. She said that although the record reflected that the victim had tremor, fell occasionally, and used a cane, the records did not reflect that he was prone to dizziness. She said pulmonary heart disease could cause dizziness. She said the victim's kidney failure was part of rhabdomyolysis, which she said was a breakdown of muscle from severe blunt force trauma and frostbite. She said the victim was "not a healthy man." She said the victim had some senile ecchymosis on his hands, which was bruising associated with light trauma to the skin of an elderly person. She said, though, that he had bruising on his knuckles that was due to blunt force trauma. She agreed that blunt force trauma meant a body hitting an object or an object hitting a body and that the term did not address whether the trauma was intentionally inflicted. She said the ulcers on the victim's body were due to frostbite and hypothermia. She said she could not determine from a photograph whether the victim had a bruise from a heel or shoe imprint. She said that at the time of the autopsy, the victim's blunt force injuries had healed and that he would have lived had his only concern been these injuries and not the frostbite.

Dr. Mileusnic–Polchan testified that blood thinner medication should not have had a major effect on the victim's bruising and skin discoloration but acknowledged it could have caused the victim to bruise easily. She agreed the victim had no healing

15

bone fractures. She said no evidence showed the victim had chemical burns. She said she could not determine that the victim had been hit by a car. She said that the victim had a small, benign tumor in the front of his brain but that it was unlikely he had any symptoms.

On redirect examination, Dr. Mileusnic–Polchan testified that if a person were wet and outside in cold weather, the wetness would hasten frostbite. She said that if something were poured on the victim, it would "definitely make the matters worse with the frostbite." She agreed that if something caustic were poured on the victim's pants that caused the fabric to melt, this would hasten frostbite due to the exposed skin. She said she had never seen bruising as extensive as the victim's from a fall from standing, even in patients who took blood thinner medication. Regarding the victim's scrotal sac swelling, she said this could happen due to accumulated fluid and failed circulation, rather than trauma. She said, though, that if the evidence showed the scrotum was bruised black, this indicated trauma. When shown a photograph dated November 18, 2009, she said the scrotum appeared bruised.

Cynthia Lewis testified that she knew [Petitioner] through her ex-husband, who had been [Petitioner]'s classmate. Ms. Lewis acknowledged that she was on three years' probation for manufacture of methamphetamine. She agreed she contacted Larry Moses and gave him a statement in April 2010. She agreed she was uncomfortable about testifying.

Regarding visitation at the McMinn County Jail, Ms. Lewis testified that an officer recorded a visitor's name, driver's license number, and the name of the inmate the person is visiting. She said visitors pass through a metal detector. She said the visitor and the inmate are separated by glass and speak by telephone. She said that on January 31, 2010, she visited her boyfriend at the jail and that she saw [Petitioner], who was also visiting an inmate. She said she was surprised [Petitioner] was not an inmate because she read in the newspaper that [Petitioner] had been arrested. She said [Petitioner] told her that it had been a misunderstanding and that "she didn't do it or they didn't do it." She said [Petitioner] also stated, "Girl, we beat him down," but did not specify if Mr. Bryson was involved. She said [Petitioner] stated that she and the "Old Man" argued about the car and medication. She said that she did not know the victim and that [Petitioner] did not refer to him by name.

On cross-examination, Ms. Lewis denied that she was coerced to testify. She said [Petitioner] stated that during the argument, the victim hit her with a "cane or something." Ms. Lewis said she was not using methamphetamine on January 31, 2010. Ms. Lewis said she had been in jail once. She said that she was arrested on February 14 but did not specify the year, that she gave a statement on April 7, 2010, and that she was placed on probation around Thanksgiving 2010.

On redirect examination, Ms. Lewis testified that although her plea agreement specified that she was not to commit any crimes, including perjury, her plea

agreement did not involve [Petitioner]'s case. She said [Petitioner]'s case was never mentioned in connection with her case. She said she did not request consideration in her case for giving a voluntary statement relative to [Petitioner]'s case.

William Scott Cass, the owner of East Tennessee Auto Outlet and a land developer, testified that he previously served as a reserve deputy for Sheriff Steve Frisbee. He had known the victim for about fifteen years. He said that he was a deacon at the victim's church and that they were friends and talked about personal and church matters. He estimated they had one-on-one conversations twenty-five times. He said they talked at church or at Mr. Cass's business, not at the victim's house. He said the victim was quiet and paused before answering questions. He said the victim played harmonica with the church's choir. He said that until "[p]robably a year prior, give or take two or three months," the victim attended church three times a week unless he or a family member was sick.

Mr. Cass testified that the victim drove a Ford Taurus, which he said would have been worth $6000 to $6500 wholesale and $8900 retail at the time of the victim's death. He identified a photograph of the car as the one the victim drove less than two months before the relevant events, which was the last time he spoke to the victim before the victim was injured. He did not recall the car's having a large dent.

Relative to the time [Petitioner] began living at the victim's house, Mr. Cass testified that for the first couple of months, the victim attended church sporadically but eventually stopped. He thought the victim felt "humiliated" and "like he was letting the church down." He said the victim talked to him at the beginning of the time "that this went on" and that they talked about the matter several times. He said the victim felt like he could be the person to help [Petitioner] after others gave up. He said he warned the victim that [Petitioner] was a known methamphetamine addict. He told the victim that if the relationship continued, the victim's car would be confiscated, that his house would be burglarized, that [Petitioner] would have an alibi, that his car would be stolen, and that he would "wind up dead." He said the victim agreed to end the relationship because [Petitioner] had not come to church. He said he was unaware of her ever coming to church with the victim, although he was in a different church building on Wednesdays and might not have seen her.

Mr. Cass testified that he visited the victim eight to ten times during the victim's final hospitalization. He agreed that he was with Larry Moses when then-Detective Moses tried to obtain a video recorded statement. He said Detective Moses prepared the recorder and that it seemed to be working. He said that the victim was more coherent than he had been during previous visits and that the victim seemed at peace. He said the victim told him more than three times on previous occasions that he would not leave the hospital, although the victim did not specifically say he was going to die.

Mr. Cass testified that on the date the recording was attempted, the victim stated: [Petitioner] and Mr. Bryson came to his house to take the car. The victim did not

17

want them to take the car, and Mr. Bryson struck him in the stomach. [Petitioner] and Mr. Bryson beat the victim "to a place in his yard . . .where he had a little bench or something" and threw an unknown substance from a jar on him. The jar looked like a "fruit jar." The altercation occurred around dark. [Petitioner] and Mr. Bryson "returned," took the car keys from the victim's pocket, and [Petitioner] said, "You will not be needing these anymore, you old bastard."

Mr. Cass testified that he could not recall whether it was on the date the recording was attempted but said the victim stated that the altercation occurred on Friday and that [Petitioner] and Mr. Bryson returned three times on Saturday. He said the victim stated he was unable to get up and go into the house. He said the victim was always concerned about his safety at the hospital.

On cross-examination, Mr. Cass testified that the victim was told by church leaders other than himself that he could not participate in the choir while living with [Petitioner] without marriage. He thought this was around the time the victim stopped attending church. He acknowledged he was never at the victim's house while [Petitioner] lived there or after the incident. He agreed he had used recording devices in a law enforcement capacity previously. He said had never had a recording fail before the one in this case. On redirect examination, he said he would not change his testimony based upon friendship with Larry Moses.

Douglas Williams testified for the defense that he had been a friend of [Petitioner] and her family for thirty years. He had known the victim for three or four years before the victim's death. He said the victim and [Petitioner] lived together for a "pretty good while" before the victim's death. He said he had seen the victim give [Petitioner] the victim's car to drive and had seen [Petitioner] driving it alone. He said he had seen the victim and [Petitioner] visiting [Petitioner]'s mother, Faye Willis, twice.

Mr. Williams testified that [Petitioner] told him "they" could use extra money and that he told her she could help him haul scrap metal the next day for half of the payment. He said that he picked her up the next morning and that when they returned after completing the work, the victim was lying on the driveway near the steps. He stated that the victim was conscious, that they checked on him, and that they helped him sit up. He said the victim had a "place" on his head, skinned arms, and one of his shoes was by the steps. He thought the victim fell down the steps but said they never could get a "straight answer" about what happened. She said that they took him into the house and that [Petitioner] "doctored him up." She said this was one to one and one-half years before November 9, 2009. He said he had seen the victim with cuts and bruises but had never seen him after having fallen on other occasions.

Mr. Williams testified that he saw [Petitioner] "off and on." When asked about other evidence that [Petitioner] was a bad influence on the victim, he said that both parties did not always use good judgment. He denied any knowledge of [Petitioner]'s using methamphetamine. He was unaware of [Petitioner]'s selling the victim's household

items and said he was aware [Petitioner] and the victim went to antique stores together.

On cross-examination, Mr. Williams acknowledged that he did not want [Petitioner] [to] go to jail. He agreed he had known [Petitioner] had been a drug user over the years but did not know how often she used drugs. He denied any knowledge of her selling drugs.

Nellie Faye Willis, [Petitioner]'s mother, testified that the victim and [Petitioner] had a relationship on November 9, 2009. She did not think the relationship was romantic and said [Petitioner] stated the relationship made the victim happy. She said the victim was lonely. She said [Petitioner] cleaned for the victim and drove for him due to his tremor from Parkinson's Disease. She said that they had been to her house two or three times and that she liked the victim. She said [Petitioner] lived at her house but did not know if [Petitioner] spent the night at the victim's house.

Ms. Willis testified that two or three months before the events in this case, [Petitioner] and the victim walked to a grocery store together. She said that the victim asked [Petitioner] to shop for him, that he wanted to walk home, and that he fell, lost his shoe, and was badly bruised. She thought the victim was able to walk home, though, before [Petitioner] returned. She thought this was not the incident about which Mr. Williams testified. She knew [Petitioner] had used drugs. She said that [Petitioner] worked for the victim and that he assisted [Petitioner] financially.

Ms. Willis testified that the victim called her house at about noon on November 8, 2009, and asked if [Petitioner] was there. She said that [Petitioner] had come to her house about 4:00 a.m. on November 8 and that Mr. Bryson was already at her house when [Petitioner] arrived. She said that [Petitioner] wanted to sleep but that she told [Petitioner] she could not sleep if she did not do it at night and that she told [Petitioner] she needed to leave. She said she last saw [Petitioner] at 7:00 or 7:30 a.m. when [Petitioner] and Mr. Bryson left. She stated that [Petitioner] did not own a working car and that she did not know in whose car [Petitioner] arrived. She said that she tried to call the victim that afternoon to see if [Petitioner] had arrived with his car but that she did not reach him. She said that when she spoke with the victim that morning, he had not asked about his car. She said the victim called and spoke with her boyfriend a couple of times after she spoke with him around noon.

On cross-examination, Ms. Willis acknowledged that [Petitioner] had been a crack cocaine user. She acknowledged [Petitioner] had come to her for money when [Petitioner] was using drugs, although her testimony was unclear whether [Petitioner] asked for money or stole it. She was unsure how long [Petitioner] assisted the victim. She was unaware of the victim's and [Petitioner]'s pawning each other's possessions but acknowledged knowing they went together to pawn his possessions. She agreed that about eight years earlier, [Petitioner] had been in Florida for about one year. She agreed that Mr. Bryson was the [Petitioner]'s boyfriend and that the victim was not. She knew that the victim reported [Petitioner]

19

had stolen his car and that the case went to court but did not know of any additional reports of this nature. She agreed [Petitioner] sometimes left her house and did not return for a day or two. She said the [Petitioner]'s last employment had been caring for a friend's father six or eight years earlier. Regarding the prior incident in which the victim fell and lost his shoe, she said that [Petitioner] told her about it but that she did not witness it. She said Mr. Bryson did not live at her house. She was unaware of Mr. Bryson's having a job. She agreed the victim did not like Mr. Bryson. She did not know when [Petitioner]'s relationship with Mr. Bryson began. She said [Petitioner] called her at 8:00 a.m. on November 9, 2009, after [Petitioner] found the victim.

[Petitioner] testified that she met the victim about three years before the relevant events. She said she saw him approximately every other day to a couple of times a week. She said that she had been divorced for fifteen years and that the victim never married. She said that she took the victim to medical appointments, that they grocery shopped, that they went to antique stores, that they ate in restaurants, and that she did his housework and cooking. She said that in return, the victim allowed her to use his car. She said she lived with her mother but sometimes stayed overnight at the victim's house because it was easier if she had to take him to a medical appointment. She said she had not owned a car for "a long time."

[Petitioner] testified that she never took advantage of the victim. She said the victim always looked at items and decided whether he wanted to keep them before she sold them at antique stores. She said they split the proceeds. She said that the victim received Social Security Supplemental Income (SSI) and that she was unaware of his having other income. She denied encouraging the victim to write "bad" checks but said she was aware from his bank statements that his account was overdrawn. She said the victim gambled on sporting events and bought lottery tickets. She said the victim's "bookie" left money in his mailbox. She said that when the victim received his SSI checks, convenience store employees sometimes called and told her the victim had been in the parking lot for hours playing scratch-off lottery tickets. She said the victim would have taken the car key from her before she got out of bed and said he was "just" going to the store. She said that on other occasions, the victim walked to stores because he liked walking.

[Petitioner] testified that the victim complained to the Etowah Police Department about her taking his car. She said that when she returned to the victim's house, Chad Bogle was waiting in the driveway. She was unsure when this occurred. She said that she had gone to the store to get cigarettes and that the victim panicked when she did not return. She denied trying to sell the victim's car without permission, trying to "scrap" it for money, and leaving the county in it other than to take the victim to his medical appointments. She said that the victim paid for her to be on his car insurance for a few months but that she told him he did not have to have her on the policy if she did not live full-time in his household.

Regarding the events leading to November 9, 2009, [Petitioner] testified that she saw the victim on Friday around 2:30 a.m. She said she could not sleep due to a migraine headache and went to her mother's house for medication. She said the victim was on the couch shuffling cards. She said that he slept on the couch and that she slept in one of the bedrooms. She said she knew her mother was going to be upset with being awakened when she came in the house. She said her boyfriend of four years, Mr. Bryson, was at her mother's house.

[Petitioner] testified that she lived with Mr. Bryson previously but left before meeting the victim due to drug activity at Mr. Bryson's trailer. She said that Mr. Bryson had been convicted of promotion of the manufacture of methamphetamine and that although she was arrested when she pulled into the driveway, the charges were dismissed because she did not possess drugs or drug paraphernalia. She said she could not go back to Mr. Bryson's trailer because it was quarantined. She said Mr. Bryson was in jail for six months and then moved to his mother's house.

[Petitioner] testified that Ms. McCleary visited the victim at home and called to check on him. She said that although Mr. Cass never came to the victim's house, she had been in the car when the victim went to Mr. Cass's business to talk to him. She stated that Mr. Cass never called to check on the victim but that the victim spoke to Mr. Cass by telephone.

[Petitioner] testified that she made the list of furniture and dollar amounts. She said that a friend, Carol Blair, wanted to sell furniture Ms. Blair had stored in Englewood and that other friends were moving and needed furniture. She denied that she was trying to sell the victim's belongings and said, "That is a totally different set of furniture." She denied selling or pawning anything without the victim's permission.

[Petitioner] testified that damage to the front of the [victim]'s car occurred several months before the victim was injured. She said that she was involved in an accident with a truck and that the victim's insurance paid him $1300.

Regarding the Saturday before the victim was found, [Petitioner] testified that she arrived at her mother's house around 3:00 a.m. She said she and Mr. Bryson stayed in the driveway the rest of the night because her mother would not permit them to come inside and sleep. She said they left about 7:30 a.m. and went to Mr. Bryson's quarantined trailer to retrieve personal belongings. She said most of the items found in the victim's car were their belongings from the trailer. She said she planned to put the items in the victim's basement or an outbuilding at her mother's house. She said she had other items stored in the victim's basement.

[Petitioner] testified that after she and Mr. Bryson left his trailer, they went through antiques with Wendy Millsaps. She said that Ms. Millsaps was concerned she would receive a probation violation for not paying her fees and that [Petitioner] identified items that could be sold. She said they planned to split the proceeds. She said that when they left Ms. Millsaps's house, they gave Penny Morgan a ride to Susan

Shelton's house in Etowah. She said Darlene Frazier called and asked her for a ride from Parkstown to East Etowah. She said she and Mr. Bryson parked across the road from her mother's house for a while because they did not have money for gas. She said she received a text message from Ms. Morgan asking for a ride from Ms. Shelton's house to Ms. Millsaps's house. [Petitioner] testified that she talked to the victim by telephone several times on Saturday when she was at Ms. Millsaps's house. She said he stated that he was okay and that a home health nurse had not been to see him that day. She said that he had been released from the hospital on Halloween and that nurses were monitoring his Coumadin level daily. She thought she last spoke to him around 2:30 p.m. She said he did not ask her to return to his house or to return his car. She said she tried to call the victim around 4:00 or 5:00 p.m. but did not receive an answer.

[Petitioner] testified that she and Mr. Bryson spent Saturday night in Ms. Shelton's driveway because they did not want to wake the residents. She said they went inside around 5:00 a.m. Sunday morning when they saw the porch light come on. She said she knew the time because Sunday was her daughter's birthday and she always called her daughter at 6:46 a.m. on her birthday. She said that after she spoke with her daughter, she went to get cigarettes and fast food. She said she kept calling the victim, did not receive an answer, and went to his house. She recalled leaving a message, which she said had not been played by the State during its case-in-chief, in which she sang nursery rhymes to try to wake the victim. She said that the victim did not have normal sleep patterns and that he frequently "nodded off" while sitting. She was aware of his medical history, including his pacemaker.

Regarding a statement of the victim that he thought he had been hurt elsewhere and brought to his house and left around 11:00 p.m. Saturday night, [Petitioner] testified that she never left with the victim and brought him back during the relevant time period. She said she had never had the victim and Mr. Bryson in the car together. Regarding the victim's November 12, 2009 statement that he and [Petitioner] argued about her using the car, she denied any such argument occurred on Saturday night. She said she did not see the victim from Friday night until Sunday morning, although she spoke with him by telephone. Regarding the victim's statement about a scuffle, she denied that she and Mr. Bryson had a scuffle with the victim at the broken bench. She said she never took Mr. Bryson to the victim's house until November 9, 2009. She denied that she dragged him about seventy-five feet with the car while he held the door handle.

[Petitioner] testified that the victim sometimes sat or talked on the telephone at the concrete bench but denied that she spent time near it. She said the bench had been broken before the victim was found on November 9, 2009. She did not know how the bench was broken but said she noticed it when she went to the house during the victim's October 2009 hospitalization.

[Petitioner] testified that although she had "tried" methamphetamine previously, she was not using it around November 9, 2009. Regarding her previous arrest involving

methamphetamine at Mr. Bryson's trailer, she said she pulled into the driveway and never got out of the car. She said that she had no drugs or paraphernalia and that her charges were dismissed. When asked about prescription medication, she said, "I have never wanted to do pills." She knew the victim took pain medication. She said that she smoked crack cocaine, that the victim had been with her to purchase it, and that she used it at his house. She acknowledged Mr. Bryson used methamphetamine but said he had been in jail for six months until his release on August 15, 2009.

[Petitioner] denied the victim's allegations that [Petitioner] wanted to get more "dope"; that the victim did not want her to leave; that she, Mr. Bryson, and the victim fought; that she and Mr. Bryson beat the victim and threw something on him from the car; and that they left the victim lying on the ground. She said, "It never happened." Regarding the Faygo orange soda can found near the victim's cane and shoe at the bench, she denied that she or Mr. Bryson threw orange soda on the victim. She said she and the victim sometimes bought Faygo drinks at Fred's, which previous testimony established was near the victim's house. She said the victim usually walked with a cane. She said the victim had his mailbox moved closer to his house after he became unable to walk down his long driveway but did not know when. She denied that she ever threatened to hit the victim with his cane or that she ever physically assaulted him. She said the only threat she made was to put the victim's car "on blocks" to prevent him from driving because he had totaled two cars and because she did not want to be responsible for his killing someone after his doctors told him not to drive.

[Petitioner] testified that she did not recall that she and the victim ever fought about her using the car and agreed that any arguments were about his driving it. Regarding her arrest related to taking the car, she said she left the victim's house to buy cigarettes when he was asleep and left him a note. She said [the victim] was unable to reach her because her cell phone was broken and was at the house. She said that he panicked and called the police, that Chad Bogle was in the driveway when she returned, and that she was arrested for theft. She said the theft charge related to her taking $20 from the bank to pay for gas, cigarettes, and Mountain Dew. She said this incident was the only time she went to jail for taking the car. She said the victim picked her up from jail and paid her probation fees. She said that the victim stated that he would never call law enforcement again and that he could have bought her a car for less money. She said she continued to live at the victim's house after the arrest.

[Petitioner] testified that she became concerned on November 9, 2009, when she could not reach the victim by telephone. She thought she and Mr. Bryson arrived at the victim's house around 7:30 or 8:00 a.m. She said that after the police arrived, they asked her to move the victim's car in order for an ambulance to reach the victim. She marked on a drawing the locations where she first parked, where she moved the car, and where she usually parked. She said that when she saw the victim unconscious on the ground, she tried to wake him. She said, though, he was able to

respond by saying "okay" to her. She said she got a blanket and the telephone from the house, called 9–1–1, and put the blanket on the victim. She said Mr. Bryson stood by the car. She said that at some point, Mr. Bryson started walking away. She said they knew the victim would be mad if he saw Mr. Bryson. She said that she yelled for Mr. Bryson to help her and that the victim had a "look of rage." She said that the victim knew she previously dated Mr. Bryson and that once shortly after she met the victim, she had the victim take Mr. Bryson to work because she was sick.

[Petitioner] testified that she did not see that the victim's pants were melted but that she did not pay attention to his legs. She said Mr. Bryson noticed the victim's bruising and told her they could not move the victim and should call for help. She said the police officers thought the victim had been hit by a car due to his bruising. She said that when the police arrived, she went into the house to get a list of the victim's medications and his wallet for them.

[Petitioner] testified that Sergeant Armstrong told her she was not allowed to return to the victim's property. She said Sergeant Armstrong told her that the victim's sister had complained previously about her being at the victim's house. She said she had clothes at the victim's house that she never recovered. She said that she was walking away when Ms. McCleary arrived and that she did not remember talking to her. She said she was upset that she and Mr. Bryson had to walk home. She said she was not allowed to get her hairbrush or handbag from the car. She said she was upset because it was cold, she had to sit in a police car for forty-five minutes, the experience had been upsetting, she had been treated like a "common criminal," and they had to walk home.

[Petitioner] testified that she loved the victim and that she would have done anything to help him. She said that the victim proposed to her but that she refused because she did not love him romantically. She said they did not have a physical relationship. She said their relationship was mutually beneficial because she took him to medical appointments, cleaned his house, did his laundry, and provided companionship. She said they had good times together.

[Petitioner] testified that she knew Ms. McCleary from years ago because her younger brother had been friends with Ms. McCleary. She said she worked for Mr. Cass's father years earlier. Regarding Mr. Cass's testimony that she was a methamphetamine addict, she said people made assumptions about her.

[Petitioner] testified that the victim fell often. She said that on one occasion, they were at a grocery store together when the victim decided to walk home before she finished shopping. She said that when she returned home, the door was locked. She walked back to the store to look for the victim and did not find him. When she returned to the house a second time, the victim was in the living room with his back bleeding. When she asked the victim where he had been, he told her that he did not know "where the h——["] he had been, that he had taken a shortcut, and that he had fallen. She said they searched a "briar thicket" the next day for the victim's lost

24

cane and shoe. She said this occurred shortly before the victim's October hospitalization. She said that this incident was not the same fall about which Douglas Williams testified and that [Petitioner] lost a shoe in the incident Mr. Williams described.

[Petitioner] testified that she was arrested on December 3, 2009. She said she had powder cocaine, marijuana, and drug paraphernalia when she was arrested. She denied making any statements to other women who were in jail with her. She said she was housed in an "open pod" with about fifty women. She said that she had never been "crazy" about Brandi Stiles and that Ms. Stiles "was always a big liar." She denied confiding in her. She said that during the time she was in jail with Ms. Stiles, television news provided information about her, Mr. Bryson, and the crime and stated that they confessed.

[Petitioner] testified that she and Cynthia Lewis's ex-husband had been high school classmates. She said Ms. Lewis came to jail visitation "clammed up" on methamphetamine. She said Ms. Lewis's statement regarding facts she allegedly told Ms. Lewis was "totally untrue." She said she was told that law enforcement asked witnesses, including Ms. Shelton and Kim Morgan, about methamphetamine chemicals having been thrown on the victim. She said that neither she nor Mr. Bryson had manufactured methamphetamine and that he only provided a place for its manufacture. She said that to her knowledge, methamphetamine was never made in the victim's house. Regarding Ms. Stiles's statement, she denied that she smoked marijuana before calling 9–1–1.

Regarding the victim's statement that she took the victim's keys from his pocket, [Petitioner] testified that he did not have keys. She said that she had one set of keys and that the other was at Title Max because he had pawned the car title.

On cross-examination, [Petitioner] testified that her mother's and the victim's houses were about ten minutes apart. She acknowledged that on the Saturday morning before November 9, 2009, she could have arrived at her mother's house around 4:00. She said she was "guessing" about the time. She said Mr. Bryson was already at her mother's house because she left him there around 4:00 p.m. on Friday when she went to the victim's house. She said that Mr. Bryson came outside with medication for her migraine and that they sat in the driveway. She denied they smoked crack. She agreed she and Mr. Bryson did not have jobs but said she sometimes had money from odd jobs. She said the victim sometimes had money. She agreed the victim sometimes gave her money and was with her when she bought drugs. She said that the victim did not use drugs and that she sometimes used them in her room at his house.

[Petitioner] testified that although she was thin in a photograph exhibit, she was not thin due to crack cocaine addiction. She said she had gained about thirty-eight pounds in jail because she did not get any exercise and was fed carbohydrates.

[Petitioner] testified that she did not sell any of the victim's furniture. She said he told her she could have anything she found buried in a collapsed outbuilding. She said that there were items in the attic she sold with his approval and that they split the proceeds.

[Petitioner] testified that although she was arrested in the victim's car in Mr. Bryson's driveway in February 2009, she had not been inside Mr. Bryson's trailer. She said that although she knew what was happening inside the trailer, she no longer lived there. She agreed her daughter, Elisha Greene, was "using" the trailer as a methamphetamine laboratory. She said she was afraid of methamphetamine and agreed it was dangerous. She was aware a person might be burned by the chemicals. Regarding Saturday, November 8, 2009, [Petitioner] testified that she and Mr. Bryson stayed at his trailer for two to three hours and went to Ms. Millsaps's house around 10:00 or 11:00 a.m., where they stayed until 7:00 or 8:00 p.m. She said they went to Ms. Shelton's house and stayed no more than forty-five minutes. She said they went to give Ms. Frazier a ride and arrived at her house about twenty minutes later. She said she and Mr. Bryson parked across the road from her mother's house and listened to the radio, talked, and "smooched." She said Ms. Morgan called around 10:00 or 11:00 p.m. to ask for a ride to Ms. Millsaps's house to pick up Joey Millsaps. She said they picked up Ms. Morgan and Mr. Millsaps and took them to Ms. Shelton's house around 11:00 p.m. to midnight. She said they picked up Ms. Frazier and dropped her off at her boyfriend's house around 2:30 a.m[.], then sat in Ms. Shelton's driveway from about 3:00 a.m. until about 5:00 a.m. She said that although she was unsure about the times she was at these locations, she was sure she was not at the victim's house that night.

Regarding the list of furniture and dollar amounts that was found on the victim's front porch, [Petitioner] testified that the victim had items in his home that were similar to those listed, including a new mattress and box springs. She said the victim's brother, Verlin, had furniture stored in the victim's house, including a new mattress and box springs.

[Petitioner] testified that Ms. Frazier introduced her to the victim when she gave Ms. Frazier a ride to his house in Mr. Bryson's truck. She said she went back later on her own and talked to the victim. When she decided to move out of Mr. Bryson's trailer, she asked the victim if she could store her belongings in his basement, and he agreed. She said that they started becoming friends and that he began offering to help with her transportation and taking her to restaurants. She said that later, he began asking her to take him to medical appointments. She said that the victim drove short distances at first but that eventually, his medical conditions worsened and that he could not drive. She did not recall the date she began staying at the victim's house but said it was no more than two years before his death. She recalled spending two Thanksgivings with the victim.

[Petitioner] testified that when she found the victim on November 9, 2009, she saw bruising on his hands before the EMTs removed his clothes. She acknowledged the

victim did not have the same injuries the first time he fell but said he was not taking Coumadin then.

[Petitioner] testified that Mr. Bryson was not the "cook" for the methamphetamine production at his trailer. She said he received free drugs. She denied he gave her money. When asked if he gave her drugs, she said he gave her "nothing but love." She said that the victim gave her money, that she chose what to do with her money, and that the victim did not support her drug habit. She said the people who testified about the victim's prior financial stability never came around him, but she was with him daily. She denied an ongoing tension existed about her using the victim's car. She said the victim apologized to her after her joyriding arrest.

[Petitioner] testified that the victim must have imagined she was at the house during the time he was on the ground injured. She said he made comments about things he was unsure were real or a dream, including his having raped a woman thirty years earlier. She said that the victim stated he was starting to sound like his brother, who had Alzheimer's Disease, and that she told him he needed to talk to a doctor.

[Petitioner] testified that on November 9, 2009, she parked near the victim. She disagreed with Chief Armstrong's testimony about the car being forty to fifty-five feet from the victim. She did not remember how many feet she moved the car when Chief Armstrong asked her to move for the ambulance. She denied telling Ms. Stiles that she and Mr. Bryson "beat down" the victim and that they made methamphetamine at the victim's house. She denied telling Ms. Stiles she waited a while after finding the victim before calling 9–1–1. She said Ms. Stiles had always been a liar. Regarding her statement, "It was bad," to Ms. Stiles, she said she was referring to the victim's condition. She said Ms. Stiles's statement that [Petitioner] laughed during a news broadcast about the crimes was "absurd." She denied that Mr. Bryson poured something from a jar onto the victim. She said Mr. Bryson was "clean" at the time. When asked if she or Mr. Bryson kicked the victim's testicles, she said she "never raised a hand" to the victim. She denied leaving messages for the victim because she was worried things had gotten out of hand. She said Ms. Morgan, Ms. Shelton, and Ms. Millsaps were afraid to cooperate with Chief Moses, to whom they referred as the "drug officer." She said that if they did not corroborate her testimony, they were lying.

On redirect examination, [Petitioner] testified that she thought she knew the victim around three years. She said the victim had tremor from Parkinson's Disease, a pacemaker, a defibrillator, and back pain that required shots at a pain clinic.

Regarding the joyriding arrest, [Petitioner] testified that she was gone about an hour. She said that if her cell phone had been working and with her, the victim would have asked if she thought it was time to come home and there would have been no further issue. She said the victim showed mental changes in the time she knew him.

Dr. Ronald Wright, an expert in clinical, anatomical, and forensic pathology, testified that he reviewed the victim's autopsy report, the Etowah Police Department records, the victim's hospital records, most of the victim's prior medical records beginning around 2000, and the State's discovery. Regarding photographs of the victim, he noted discoloration and "skin slip" that was consistent with hypothermia. He also noted sun damage. He could not identify a cause of the victim's torn skin. He agreed skin damaged more easily as a person aged. He said that hypothermia caused a person to lose the sensation of cold and that victims sometimes took off their clothes. He said it was not unusual for a hypothermia victim to feel a burning sensation. He said that hypothermia caused discoloration from leaking blood vessels that looked like bruising. He said some injuries might have developed from the victim's having been picked up and moved by the emergency personnel. He said a person might develop injuries on the palms, knees, and stomach from crawling. He said scratches on the victim's abdomen were consistent with his having dragged himself on his abdomen. He was "essentially absolutely certain" that discoloration on the victim's abdomen was not from blunt force trauma and was not from a heel, fist, or billy club. He said that the abdomen generally did not bruise and that in his opinion, the discoloration was from hypothermia, although it could have been from blunt force trauma.

Dr. Wright testified that in his opinion, the sores and lesions on the victim's legs were from hypothermia, although he acknowledged they could have been from blunt force trauma. He said the injuries on the victim's arm and chest were "suspicious looking" and might have been from blunt force trauma. He said a more accurate determination could be made if pictures of the victim had been taken at the scene. He said that bruising to the victim's hip was not from kicking because kicking would cause greater injuries in an elderly victim. He said injuries on the victim's left hand were not consistent with defensive wounds and could have occurred when the victim was moved by emergency personnel. He said it was unlikely that discoloration around the victim's right eye was caused by blunt force trauma. In his opinion, the victim's enlarged scrotum was due to fluid retention from the administration of intravenous fluids to raise the victim's blood pressure, not blunt force trauma. He said none of the injuries in the photographs appeared to be burns. He did not think pseudoephedrine would burn skin. He said that three doctors commented in the medical records that the victim was an unreliable historian but that no mental examination for dementia was performed. In his opinion, the victim's dementia would have been worse after he developed hypothermia. He said that the victim developed renal failure and that the victim's family elected not to have dialysis performed. The victim's medical records from UT Medical Center were received as an exhibit.

Dr. Wright testified that he disagreed with Dr. Mileusnic–Polchan's conclusion about the cause of the victim's death. He said that the primary cause was hypothermia and that the sepsis was a complication of hypothermia. He said that the victim also had kidney, brain, heart, and lung diseases that were contributing factors and that the victim was "basically at death's door" before developing

28

hypothermia. He classified the victim's manner of death as undetermined because it could have been homicide, accidental, or natural disease.

Dr. Wright testified that the medical records that predated the victim's final hospitalization documented that the victim could not walk distances and that he used a cane. He noted an April 3, 2009 letter from one of the victim's doctors stating that the victim was incapable of getting his mail at the road and needed his mailbox moved to his front porch. He said that based upon this information, the victim might have fallen and his death been from natural causes.

On cross-examination, Dr. Wright testified that when the victim was admitted to the hospital, his Glasgow Coma Score, which measured mental status, was 9/15. He said the victim's score improved to the "teens" over time but never reached fifteen. Regarding Dr. Mileusnic–Polchan's characterization of some of the victim's injuries as bruises, he said an incision at the site was necessary to determine whether they were bruises. He said bruises did not occur unless a bone was underneath the skin. He said that swelling of the testicles from intravenous fluid therapy typically occurred after three or four days and that bruising would not result from administration of fluids. Regarding prior testimony about the victim's scrotum being swollen to the size of a cantaloupe, he said this might or might not indicate trauma.

Dr. Wright testified that frostbite did not melt pants fabric. He agreed that items used to manufacture methamphetamine were caustic and could "eat right through" skin and cause burns. He said it would be unusual for the items to melt pants, though, because they tended to cause explosions.

On redirect examination, Dr. Wright testified that he had concerns about the slow speed at which the victim's body was rewarmed when he was taken to the hospital. He said that allowing a patient to remain with a low core temperature for a longer time caused more things to "break." He agreed that a doctor noted on December 10, 2009, that the victim was unresponsive and incompetent. He agreed that the victim reported to hospital personnel that he could not walk well. On recross-examination, he said that his interest within the field of forensic pathology was the electric chair and that he helped design the State's electric chair.

Chief Moses was recalled as a defense witness and testified that his final conversation with the victim was December 9, 2009. He recalled the date because it was a day after his anniversary. He acknowledged that after reviewing his testimony in a previous hearing, his recollection was refreshed that the victim told him on December 9 that [Petitioner] participated in the scuffle after he was on the ground. He said the victim identified Mr. Bryson as the person who kicked him in the groin but agreed he had not mentioned it in his previous testimony. He agreed he checked the victim's basement and did not find any evidence of methamphetamine production. He described different methods of methamphetamine production, including the "Shake and Bake" or "Shake Bottles"

29

method involving shaking liquid and a lithium battery in a twenty-ounce bottle. He agreed the victim said something was poured on him and said he did not smell or see anything on the victim's shirt or undershirt to support this. He said he was unable to recover the victim's pants and thought they had been destroyed.

Chief Moses testified that he photographed pill bottles in [Petitioner]'s bedroom at the victim's house. He said there were numerous empty or partially empty pill bottles in the kitchen.

On cross-examination, Chief Moses testified that despite the [Petitioner]'s testimony about the victim's having said he did not know "where the h——["] he had been, he had never heard the victim curse unless he had been asked to repeat exactly what someone else said. He said that the victim walked about one and one-fourth miles to the police station to complain about his missing car and that the car was found at Mr. Bryson's trailer that day.

The 9–1–1 recording was played. It was not transcribed by the court reporter, and the recording was not made an exhibit.

On rebuttal proof, Ellen McCleary testified that she never heard the victim swear. On cross-examination, she said that she had seen the victim's reactions in many situations and that his vocabulary was always consistent.

William Scott Cass testified that the only time he ever heard the victim use a curse word was when the victim repeated [Petitioner]'s statement, "You will not be needing these any[]more, you old bastard." He said the victim was asked not to participate in the choir due to his allowing [Petitioner] to live with him. He agreed that he blamed [Petitioner] for problems the victim had at the end of his life. He thought that the day he attempted to record the victim's statement was in November, not December, 2009.

Penny Morgan testified that she and Susan Shelton were roommates. She said that shortly after dark on November 9, 2009, she asked [Petitioner] for a ride. She said that [Petitioner] and Mr. Bryson picked her up, that they were gone about twenty minutes, and that [Petitioner] and Mr. Bryson came into the house for about ten to fifteen minutes when they brought her back home. She said she did not see [Petitioner] again that night. She was positive she only saw [Petitioner] once that night. She said she went to bed and was awakened by the police knocking on her door. She said she told the police [Petitioner had] not been with her all night long. She said she got out of bed around 3:00 or 4:00 a.m. to get a drink of water and heard a knock at the door but did not answer. She said she did not hear a car start after the knocking. She said that [Petitioner] later told her that [Petitioner] and Mr. Bryson stayed in the driveway until daylight but that she did not see them because no window was by the driveway.

On cross-examination, Ms. Morgan testified that [Petitioner] called her phone that night but that she did not answer. Regarding a prior statement, "Around 5:00 a.m. this morning they left maybe an hour later," she said she referred to the time someone had pulled into the driveway.

Susan Shelton testified that [Petitioner] came to her house on Saturday, November 8, 2009, around dark. She said that [Petitioner] was with Mr. Bryson and that she assumed they picked up Ms. Morgan. She said neither [Petitioner] nor Mr. Bryson came into the house when they picked up Ms. Morgan. She said they brought back Ms. Morgan about twenty to thirty minutes later and stayed in the house for about ten minutes. She said she did not see [Petitioner] again that night. On cross-examination, she agreed that she and [Petitioner] were friends and that Ms. Morgan and [Petitioner] were friends.

Wendy Millsaps testified that she was currently in rehabilitation for methamphetamine addiction. She said she and [Petitioner] were friends in 2009. She said she saw [Petitioner] the day before the victim was found in his yard. She said [Petitioner] came to her house about 10:00 a.m. and stayed for about two hours. She said Mr. Bryson was with [Petitioner]. She did not know whose car they drove but said it was green. She said they looked through her antiques to find items to generate money because she was afraid her probation was going to be revoked. She was certain [Petitioner] was not at her house for nine hours. She said she did not see [Petitioner] again that day and was certain [Petitioner] did not pick up her son that night. On cross-examination, she said that [Petitioner] told her she knew someone who would give her a good price for the antiques but that [Petitioner] never returned to pick up the antiques. On redirect examination, she said she was charged with manufacture of methamphetamine and had been clean for sixteen months.

Brandi Stiles testified that she and [Petitioner] had known each other for years. She said they were not friends but were acquaintances. She said that in late 2009 or early 2010 she was in jail for non-payment of child support. She said that when she was released, she gave a statement to the police. She said she was not asked to make the statement but did so because she was concerned about what she had been told occurred. She denied she received anything for giving the statement.

Ms. Stiles testified that she and [Petitioner] talked at various times while they were in jail together. She said [Petitioner] initially said she and her boyfriend were not involved in the crime but eventually told her "[a]round about" that they were. She said [Petitioner] wanted Ms. Stiles and Ms. Stiles's boyfriend to provide an alibi for [Petitioner] and Mr. Bryson by saying the four of them stayed together for two days.

Ms. Stiles testified that she met the victim about a year earlier when she was with [Petitioner] at his house, that the victim gave [Petitioner] money, and that she and [Petitioner] left in the victim's car. She said that at first, [Petitioner] asked her for the "word on the street" about the victim. She said [Petitioner] stated that she found the victim on the ground, covered him, and called 9–1–1. She said that she did not

watch television and that she read the newspaper only if someone told her to look at it that day.

Ms. Stiles testified that [Petitioner] overheard her on the telephone with her boyfriend discussing David Clauson, a person who assaulted someone. She said she and her boyfriend discussed a boot print on the person's chest from having been kicked and stomped. She said [Petitioner] said she saw Mr. Clauson and thought he harmed the victim. She said [Petitioner] went back and forth regarding whether she and Mr. Bryson did it or Mr. Clauson did it. She said [Petitioner] stated that the victim owed her $13,000. She said [Petitioner] stated that she "had been his little school girl and his little play toy for long enough and he promised it to her and owed it to her and she wanted it." She said [Petitioner] mentioned the money every time she talked about the victim.

Ms. Stiles testified that [Petitioner] told her that she and Mr. Bryson made methamphetamine at the victim's house when they had no other place. She said that [Petitioner] would leave the door unlocked when she took the victim to a store or a medical appointment and that Mr. Bryson would enter the home and make methamphetamine in the basement. She understood Mr. Bryson was not allowed around the victim. She thought [Petitioner] disclosed information to her because of their prior relationship when [Petitioner] dated Ms. Stiles's husband's uncle.

When asked to recount the most detailed account [Petitioner] had given her of the night the victim was injured, Ms. Stiles testified that [Petitioner] stated: Mr. Bryson was in the basement, and [Petitioner] and the victim were upstairs. [Petitioner] had hidden the victim's gun before Mr. Bryson arrived. The victim heard something and told [Petitioner] that he knew Mr. Bryson was in the basement and that he was going to put a stop to it once and for all. The victim started to go outside toward a shed. [Petitioner] yelled for Mr. Bryson to come out of the basement. An altercation between the three took place. [Petitioner] looked for the gun she had hidden earlier. The victim ended up on the ground, and Mr. Bryson stomped the victim's chest with his boot.

Ms. Stiles testified that she did not recall if [Petitioner] said she participated in stomping and kicking the victim but that [Petitioner] always said, "We did it." Ms. Stiles said [Petitioner] stated that Mr. Bryson was a Marine, was trained to kill, and did not do anything unless someone told him to do it. She said [Petitioner] stated, "My God, if I told him to jump he would be standing there in the jump position to ask how high." She acknowledged [Petitioner] might have been bragging about her control over Mr. Bryson.

Ms. Stiles testified that she was in jail with [Petitioner] during a news broadcast about [Petitioner]'s case. She said [Petitioner] laughed hysterically during the broadcast and stated that a beer bottle shown on the broadcast had been hers and that she had thrown it down after calling 9–1–1 and leaving before anyone arrived. She said [Petitioner] was confident and arrogant. She said she understood from

[Petitioner] that [Petitioner] was unsure whether the victim was alive after the altercation. She said [Petitioner] told her that she and Mr. Bryson knew they had to get the methamphetamine manufacturing items out of the house and that Mr. Bryson cleaned the basement. She thought [Petitioner] said something about going into the upstairs part of the victim's house to get a blanket. She thought [Petitioner] said that when she came outside, "she noticed that he was wet and said she started asking Ricky [Bryson] why and at that point Ricky had evidently been in the basement and cleaned up anything[.]"

Ms. Stiles testified that no one had tried to influence her testimony. She said she had not been released from jail for her testimony and had to post a bond. She acknowledged a domestic assault conviction and denied any theft or shoplifting convictions.

On cross-examination, Ms. Stiles testified that she had been jailed for failure to pay child support and that while in jail, she had a probation violation because she could not visit her probation officer. Regarding her reason for talking to Larry Moses about [Petitioner]'s statements, she said her boyfriend encouraged her to "do the right thing." She said she was in custody but was about to be released as soon as her child support payment was processed and she appeared in court the next day on her probation violation. She did not recall if she saw more than one news broadcast about the [Petitioner]'s case and said she did not watch television.

Ms. Stiles testified that the incident she discussed by telephone with her boyfriend involved an alleged assault of an elderly man, Alvin Shubert, by David Clauson. She said [Petitioner] questioned her about the telephone conversation and suggested that Mr. Clauson might have injured the victim because she had seen Mr. Clauson's girlfriend and her child on the street near the victim's driveway. She said [Petitioner] mentioned several different scenarios for how the victim was injured, including that he had a firearm he was going to use to get Mr. Bryson away from his house and that the victim's bruises were consistent with Coumadin shots. She thought [Petitioner] was trying to justify to herself what happened to the victim.

Chadwick Bogle testified that he responded to the victim's house as an Etowah Police Officer on the day the victim was found. He said he had known the victim previously. He said the victim was lying on his back and looked "petrified," scared, and in pain. He said that when he asked the victim what happened, the victim moved his eyes to his left.

On cross-examination, Mr. Bogle testified that [Petitioner] was near the victim when he arrived and agreed that the victim was covered with a blanket. He said the victim never spoke to him. He saw the victim's bruises after the paramedics removed the blanket. He said he talked to [Petitioner] and Mr. Bryson within a few minutes of his arrival. He said [Petitioner] was cooperative in giving a statement.

*Greene I*, at *1–30 (footnote omitted).

33

After the jury convicted Petitioner of the charges against her (ECF No. 18-2 at PageID 281–83), Petitioner filed a direct appeal challenging the sufficiency of the evidence to support her conviction and the trial court's admission of the hearsay statements of the victim during his hospitalization (ECF No. 18-13), the TCCA affirmed the trial court, and the Tennessee Supreme Court ("TSC") denied review. *See generally Greene I.*

Petitioner next filed a pro se petition for post-conviction relief, asserting a number of claims, including many ineffective assistance of counsel claims. (ECF No. 18-19 at PageID 2042–51.) Through counsel, Petitioner filed a supplement to this petition. (*Id.* at PageID 2074.) The post-conviction court held an evidentiary hearing on the petition (ECF Nos. 18-20, 18-21), which the TCCA summarized in relevant part as follows:

> At the post-conviction hearing, the Petitioner testified that a public defender was appointed to represent her on the day of her arraignment. The next time she saw her attorney, he waived her preliminary hearing, and her case was bound over to the grand jury. The Petitioner stated that her attorney told her that the police had a video recording of an "exchange" with the victim and that it would be presented to the grand jury; therefore, a preliminary hearing had not been necessary. The Petitioner said that her attorney was removed from her case due to a conflict of interest; thereafter, trial counsel and co-counsel began representing her. The Petitioner said that she learned at trial that the police did not have a video recording of the victim's statement.

> The Petitioner stated that she was arrested in 2009 and that she remained in custody until her trial in 2012. While she was in custody, she met with trial counsel four or five times and once with co-counsel. Each meeting lasted approximately one hour or one and one-half hours. During the meetings, trial counsel and the Petitioner discussed trial strategy.

> *    *    *

> The Petitioner said that prior to trial, the State provided the defense with a list of prospective witnesses, which included Wendy Millsaps, Cynthia Lewis, and Brandi Stiles. Trial counsel told the Petitioner that he had represented Millsaps. The Petitioner thought trial counsel had also represented Lewis, and she knew that Stiles was facing some misdemeanor charges. The Petitioner asked trial counsel about

34

representing all three women, and trial counsel responded that he did not have a conflict that would negatively impact his representation of the Petitioner.

The Petitioner recalled that Lewis testified against her at trial. The Petitioner said that her sister knew Lewis "from the streets." During trial, Lewis approached the Petitioner's sister in the court hallway and asked her to convey her apologies to the Petitioner. Lewis explained to the Petitioner's sister that she was told she would have to serve "[her] time" if she did not testify against the Petitioner. The Petitioner's sister told counsel and the Petitioner about her exchange with Lewis. The Petitioner said that she and her sister encouraged counsel to call the sister to testify regarding Lewis' remarks; however, counsel did not think Lewis' comments would have any impact on the Petitioner's trial. Trial counsel was not concerned about Lewis' testimony; nonetheless, on cross-examination, he asked if anyone had threatened to make her serve her sentence if she did not testify against the Petitioner. Lewis denied that she was coerced.

The Petitioner stated that prior to trial, she and counsel had brief discussions about whether she should testify. Trial counsel hesitated to have the Petitioner testify because he anticipated that she would be "attacked" by the State on cross-examination. Trial counsel said that he would prepare the Petitioner to testify by asking her sample direct examination and cross-examination questions; however, such preparations never occurred. The Petitioner said that the final decision regarding whether she would testify was made immediately prior to her testimony. Counsel advised her that she needed to testify so the jury could see her concern for the victim. The Petitioner acknowledged that she chose to testify but maintained that she did not feel prepared to testify. The Petitioner said that she and counsel did not discuss her defense strategy or how her testimony would further that strategy.

The Petitioner said that her trial testimony lasted approximately two days. Trial counsel asked the Petitioner 414 questions during direct examination but never directly asked if she killed the victim. The Petitioner acknowledged that on direct examination, trial counsel asked if she had poured a chemical substance on the victim, if she had a scuffle with the victim at a concrete bench, if she had thrown an orange soda at the victim, if she had ever been physical with the victim, or if she had ever threatened the victim with harm and that she denied each allegation. Nevertheless, she opined that the jury never heard her declare her innocence.

\*      \*      \*

The Petitioner said that the victim was elderly and suffered from health issues. Although his condition was "hinted at" during trial, the Petitioner thought trial counsel should have provided more information to the jury about the victim's breathing problems, which could explain his failure to get up and go inside his house. The Petitioner acknowledged that trial counsel had subpoenaed the victim's medical records but asserted that trial counsel did not use the records at trial.

35

*      *      *

The Petitioner said that trial counsel repeatedly told her that they "were not prepared to go to trial" and that he "insinuated" they had not spent sufficient time together due to his caseload.  The Petitioner said that she did not feel prepared for trial, especially after counsel failed to prepare her to testify.  The Petitioner believed counsel's failure to prepare her to testify had a detrimental effect on her case.

On cross-examination, the Petitioner said she had a total of five or six meetings with trial counsel; during the meetings, they discussed her case, he advised her that she might need to testify, and he cautioned that the State's cross-examination would be difficult.  The Petitioner acknowledged that she had wanted to testify but said that she needed to be prepared for her testimony.  She conceded that trial counsel had not acted unreasonably by waiting until the conclusion of the State's proof to require the Petitioner to decide whether to testify.  The Petitioner said that she was not able to tell her story or convey her innocence to the jury during direct examination.

The Petitioner acknowledged that during direct examination, she denied that she physically assaulted the victim, scuffled with the victim, threatened the victim, or was in the victim's yard prior to discovering the victim.  The Petitioner acknowledged that trial counsel did not need to ask additional questions after she denied "every single thing leading up to [the victim's] death."

*      *      *

On redirect examination, the Petitioner said that she did not think the jury's verdict was based on any one issue but that all of the issues had a cumulative effect on the "overall defense."  She maintained that she did not get the defense she wanted and that she wanted to tell the jury that she was not guilty "of any of the crimes."

*      *      *

Trial counsel said that he and co-counsel met with the Petitioner "numerous" times.  Trial counsel had a "fine" relationship with the Petitioner and "found her to be at least of average intelligence."  Trial counsel said the Petitioner never deviated from her version of events.  Initially, co-counsel was to be lead counsel; however, co-counsel had no prior experience trying a murder case so trial counsel decided to take the lead and have co-counsel assist him.

*      *      *

Trial counsel said that while the victim was hospitalized, the prosecutor asked the police to record a statement from the victim because the victim was very ill and was expected to die.  The police took the statement, but the recording was not made due to technical difficulties.  Several weeks later, the victim died, and the Petitioner was charged with felony murder in a superseding indictment.

36

Trial counsel said that on at least two occasions, the victim had pressed charges against the Petitioner for taking his vehicle. One or two of the charges were dismissed, but the Petitioner pled guilty to one charge in general sessions court. Because of the prior charges, the Petitioner was immediately a suspect in the victim's murder.

Trial counsel said the case against the Petitioner was based on circumstantial evidence. The Petitioner maintained that she was the victim's caretaker, while the State's witnesses alleged that the Petitioner was manipulating the victim and using him for his money and his vehicle. Trial counsel recalled that the victim had health problems, and he subpoe[]naed the victim's medical records. After reviewing the records, trial counsel hired Dr. Wright as a forensic specialist.

Regarding the Petitioner's claim that trial counsel had represented Stiles, Greene, and Millsaps, trial counsel said that he did not recall ever personally representing Stiles, but he knew from her criminal background that she had no significant convictions that could be used to impeach her testimony. Trial counsel did not recall the public defender's office representing Lewis while the Petitioner's case was pending or while the trial was ongoing. Trial counsel acknowledged that a "significant period of time" before the Petitioner was charged, he had represented Millsaps, and her case was resolved by a plea agreement. Trial counsel and the Petitioner discussed whether his prior representation created a conflict of interest. Trial counsel thought that any potential conflict would have been with Millsaps and him, not with the Petitioner and him. Trial counsel stated that Millsaps' testimony did not hurt the Petitioner's defense and that he was not concerned about her testimony; instead, he was concerned about the testimony of witnesses who testified that the Petitioner made incriminating statements.

Trial counsel recalled that the Petitioner wanted him to question Lewis as to whether she was testifying for the State to avoid serving three years for a probation violation. Trial counsel thought he cross-examined Lewis on that issue.

Trial counsel stated that the defense's theory was that the victim, who was in ill health, went outside, fell, and was unable to return to the house. In support of that theory, trial counsel retained a forensic expert who stated that the victim's injuries were the result of hypothermia, not blunt force trauma.

Trial counsel acknowledged that the victim made a "dying declaration" implicating the Petitioner as one of his assailants. Trial counsel argued to the jury that because of the victim's ill health and his injuries, he was not "a reliable witness as to what happened to him ... [and] was not competent to give a reliable, credible statement." Trial counsel said that he normally prepared his clients to testify by conducting a "mock direct examination" and "mock cross examination," and he thought he had followed this practice when preparing the Petitioner to testify. The final decision regarding whether the Petitioner would testify was made after the State concluded

its case-in-chief.  Trial counsel knew the Petitioner had some prior convictions that could be used for impeachment; however, she had always been adamant and consistent about what happened, and after hearing the State's proof trial counsel thought it was important for the Petitioner to testify to convey her version of events to the jury.  Trial counsel said that he would not have had a client in a felony murder case testify without preparing the client for the questions he intended to ask.  Trial counsel acknowledged that he "did not think [the Petitioner] made a particularly good witness" and asserted that she blamed him for her failure as a witness.  Trial counsel acknowledged that he was surprised to learn that he had not asked the Petitioner "the ultimate question" of whether she killed the victim.  He noted, however, that he knew such a question had "been objected to in the past."  Trial counsel said that his questioning of the Petitioner was designed to directly discredit the victim's statements.  Trial counsel acknowledged that he did not make any objections during the State's cross-examination of the Petitioner but said that was not unusual.

\*      \*      \*

Additionally, because the police found no evidence that anything had been taken from the victim's house, the main issue was "what happened to him? How did he end up in the yard?"

Trial counsel stated he was not "overly concerned" when co-counsel's health forced him to leave during trial, and trial counsel never considered requesting a continuance.  Trial counsel noted that co-counsel did not have a lot of trial experience and had no prior experience trying a homicide case; nevertheless, co-counsel was "[v]ery capable," and trial counsel wanted him involved in a homicide case.  Trial counsel said that he was prepared to question the critical witnesses and that co-counsel had questioned all of the witnesses he was to examine before he got sick.

Trial counsel said that the medical examiner's testimony was a problem for the defense.  The medical examiner concluded that the victim's injuries resulted from blunt force trauma, not frostbite.  Trial counsel said that the medical examiner's testimony was not entirely inconsistent with the defense theory of frostbite.

\*      \*      \*

On cross-examination, trial counsel said that he had been a public defender for approximately thirty years and had tried dozens of homicide cases.  He talked with the Petitioner about the case on multiple occasions, provided her a copy of discovery, explained the State's theory of the case, and discussed a possible plea agreement.  Trial counsel and the Petitioner agreed that the victim must have fallen accidentally and died as a result of exposure.  Trial counsel did not recall having any disagreements with the Petitioner regarding how to try the case.

Trial counsel said that the Petitioner was a good client and that she adamantly maintained her innocence. Even though the evidence against the Petitioner was not strong, trial counsel was concerned about the victim's dying declaration and the witnesses who testified about the Petitioner's incriminating statements. Trial counsel said that the Petitioner needed to testify to counter the victim's dying declaration. Trial counsel asserted that he prepared the Petitioner to testify and discussed the questions that might be asked.

Trial counsel stated that the jury's dissatisfaction with the Petitioner's testimony may not have concerned what she said but how she said it. Trial counsel did not recall the prosecutor "just running over" the Petitioner or asking many questions that were not anticipated. Trial counsel thought he made appropriate objections at trial and noted that making "hyper-technical" or insignificant objections could have been detrimental.

Trial counsel said that he had never represented Lewis. He had represented Millsaps, and he disclosed that to the Petitioner. Trial counsel thought that if any conflict existed, it had to be waived by Millsaps, not the Petitioner. He noted that Millsaps' prior charges were not related to the Petitioner's charges. Moreover, he opined that Millsaps' testimony was not significant.

\*      \*      \*

Trial counsel said that his medical expert, Dr. Ronald Wright, disputed the medical examiner's findings and testified that he did not see evidence of assault or blunt force trauma on the victim's body. He attributed the discoloration on the victim's body to frostbite or "other explanations . . . other than assaultive behavior."

Trial counsel said that the Petitioner's case was "not the strongest homicide case" he had seen "but [that] there was strong evidence." In his view, the State's strongest evidence against the Petitioner was the victim's dying declaration, followed by the medical examiner's testimony that the victim's injuries were the result of blunt force trauma. Trial counsel noted also that the Petitioner had a relationship with the victim, she was at the scene in the victim's vehicle, and [the] State's witnesses had testified about incriminating statements the Petitioner had made. Trial counsel conceded, "I'm not so arrogant to think I couldn't have tried a better case. It was a hard case. I can't attribute the result on [the Petitioner's] not being prepared. I thought she adequately answered the questions from both me and the State. It's just obviously, the Jury didn't believe her."

Trial counsel said that he made a strategic decision to introduce all of the victim's statements to show that the victim had made other statements that were not consistent with his dying declaration. Trial counsel asserted that, even in hindsight, he would not change the defense theory.

39

On redirect examination, trial counsel said that juries decide cases based not only on a witness's testimony but also the witness's attitude, demeanor, and dress. He said that his practice was to prepare, not "coach," his clients. He thought that the Petitioner was an "okay" witness but that the jury did not find her or the defense theory believable. Trial counsel had not "worried about [the Petitioner's] testimony. [He] was worried about other evidence more."

*Greene II*, at *2–9. After this hearing, the post-conviction court denied Petitioner's post-conviction petition. (ECF No. 18-19 at PageID 2087–95; ECF No. 18-21 at PageID 2352–83.) The TCCA affirmed, and the TSC denied review. *Greene II*.

Petitioner next filed the instant § 2254 petition. (ECF No. 14, originally submitted as ECF No. 2 and resubmitted to correct technical errors in the document upload process.)

## II.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") allows a federal court to grant habeas corpus relief on any claim adjudicated on the merits in a state court only where that adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" United States Supreme Court precedent; or (2) "resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

This Court may grant habeas corpus relief under the "contrary to" clause where the state court (1) "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law"; or (2) "decide[d] a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *See Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). The Court may grant habeas corpus relief under the "unreasonable application" clause where the state court applied the correct legal principle to the facts in an unreasonable manner. *Id.* at 413.

But even an incorrect state court decision is not necessarily unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's

40

determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.") (citing *Williams*, 529 U.S. at 410). Rather, this Court may grant relief for a claim decided on its merits in state court only where the state court ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Additionally, before a federal court may grant habeas corpus relief, the petitioner must have first exhausted her available state remedies by presenting the "factual and theoretical substance" of each federal claim to all levels of the state appellate system to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) (citing *Justices v. Boston Mun. Court v. Lydon*, 466 U.S. 294, 302–03 (1984)) (further internal citations omitted). In Tennessee, presentation of a claim to the TCCA is sufficient. Tenn. S. Ct. R. 39.

If a petitioner never presented a claim to the highest available state court and a state procedural rule now bars presentation of the claim, the petitioner procedurally defaulted that claim. *Coleman v. Thompson*, 501 U.S. 722, 731–32, 750 (1991). Such a claim is technically exhausted but procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Coleman*, 501 U.S. at 732; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted."). Tennessee petitioners may generally proceed only through one full round of the post-conviction process, and Tennessee imposes a one-year statute of limitation on such actions. Tenn. Code Ann. § 40-30-102(a) (one-year limitation period), § 40-30-102(c) ("one petition" rule).

On federal habeas review, the district court may review a procedurally defaulted claim only where the prisoner can show cause for that default and actual resulting prejudice, "or . . . that failure to consider the claim[] will result in a fundamental miscarriage of justice." *Coleman*, 501

41

U.S. at 750. Errors of post-conviction counsel cannot generally serve as "cause" to excuse a procedural default. *Id*. at 752–53. But the Supreme Court established an equitable exception to this rule in *Martinez v. Ryan*, holding that the inadequate assistance of post-conviction counsel or the absence of such counsel may establish cause for a prisoner's procedural default of an ineffective assistance of trial counsel claim under certain circumstances. *Martinez v. Ryan*, 566 U.S. 1, 9, 17 (2012). The Supreme Court has described the *Martinez* exception as containing the following requirements:

> [The exception] allow[s] a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel-claim;" and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] be . . . raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 13–14, 16–17). This exception, commonly referred to as the *Martinez* exception, applies in Tennessee. *Sutton v. Carpenter*, 745 F.3d 787, 792–95 (6th Cir. 2014).

In determining whether an ineffective assistance of trial counsel claim is substantial, the Court asks whether it "has some merit and is debatable among jurists of reason." *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 713 (6th Cir. 2015) (citing *Martinez*, 566 U.S. at 14). Conversely, "a claim is insubstantial when 'it does not have any merit,' 'is wholly without factual support,' or when 'the attorney in the initial-review collateral proceeding did not perform below constitutional standards.'" *Porter v. Genovese*, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting *Martinez*, 566 U.S. at 15–16).

## III. ANALYSIS

### A. Sufficiency of the Evidence

42

Petitioner first claims that the evidence was insufficient to support her convictions for first-degree felony murder, aggravated assault, and theft of property valued at more than $1,000 but less than $10,000.[1] (ECF No. 14 at PageID 91.) In its opinion affirming Petitioner's convictions, the TCCA described the elements of the crimes underlying Petitioner's convictions under Tennessee law as follows:

> Pertinent to this appeal, first degree felony murder is an unlawful "killing of another committed in the perpetration of or attempt to perpetrate any . . . theft[.]" T.C.A. §§ 39–13–201 (2010), 39–13–202(a)(2). At the time of the offense, the aggravated assault statute provided, "A person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39–13–101" and "[c]auses serious bodily injury to another[.]" *Id.* § 39–13–102(a)(1)(a) (Supp. 2009) (amended 2010, 2011, 2013). The assault statute provided, in pertinent part, "A person commits assault who ... [i]ntentionally, knowingly, or recklessly causes bodily injury to another [.]" *Id.* § 39–13–101(a)(1) (Supp. 2009) (amended 2010). "A person commits theft of property if, with the intent to deprive the owner of the property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39–14–103 (2010).

*Greene I*, at *31.

The United States Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979), provides the controlling rule for this claim. *See Gall v. Parker*, 231 F.3d 265, 287–88 (6th Cir. 2000), *superseded on other grounds Parker v. Matthews*, 567 U.S. 37 (2012). In *Jackson*, the Supreme Court held that the evidence is sufficient to sustain a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. In making this determination, the district court may not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

---

[1] Petitioner does not specify in her petition that she challenges the sufficiency of the evidence supporting each of her convictions, but the Court liberally construes the petition to do so.

43

A federal habeas court reviewing the sufficiency of the evidence must apply two levels of deference. *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007). First, under *Jackson*, the court gives deference to the verdict "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (quoting *Jackson*, 443 U.S. at 324 n.16); *see also Cavazos v. Smith*, 565 U.S. 1, 6–7 (2011) (providing that "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution'") (quoting *Jackson*, 443 U.S. at 326). The habeas court must give additional deference to the state court's consideration of the verdict under the AEDPA's highly deferential standards. *Cavazos*, 565 U.S. at 6 (noting the double deference owed "to state court decisions required by § 2254(d)" and "to the state court's already deferential review"). As such, a petitioner challenging the evidence against her "bears a heavy burden." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986).

In addressing Petitioner's claim challenging the sufficiency of the evidence to support her convictions, the TCCA cited *Jackson* and various state court cases before analyzing this claim as follows:

> Regarding the theft of property conviction, the evidence in the light most favorable to the State shows that during or immediately after Mr. Bryson and [Petitioner] assaulted the victim, [Petitioner] took the victim's keys and stated[,] "Your car won't do you any good now you old bastard," or "You will not be needing these anymore, you old bastard." The victim did not want [Petitioner] to leave in his car. She drove away in the victim's car to pursue her own concerns. We note that [Petitioner] was charged with theft of property valued at $1000 or more but less than $10,000. The testimony of Mr. Cass, a used car dealer, established that the value of the victim's car fell within the relevant range. The evidence is sufficient to support the [Petitioner]'s theft conviction.

> Relevant to the first degree murder and aggravated assault convictions, [Petitioner] contends that the medical proof was insufficient to establish the cause of the victim's injuries. [She] contends that it is just as likely the victim, who was in poor

44

health, broke the bench accidentally, was injured, and fell.  We again note that the weight of the evidence and the credibility of the witnesses was a matter for the jury's resolution.

In any event, both Dr. Mileusnic–Polchan and Dr. Wright attributed the victim's death to hypothermia, although they disagreed about the existence of blunt force trauma.  Before his death, the victim consistently identified the [Petitioner] and Mr. Bryson as having assaulted him and having taken his car.  The [Petitioner] made inculpatory statements to Ms. Lewis and Ms. Stiles about her involvement in an altercation with the victim.

Regarding first degree felony murder, the evidence is sufficient to show that the victim was killed during the perpetration of a theft.  Although the victim did not die at the time of the theft, the medical experts attributed his death to the injuries he received during the altercation that occurred when the [Petitioner] took the victim's car against his will.

The evidence is sufficient, as well, to support the aggravated assault conviction.  Both medical and lay witnesses testified about the extent of the victim's frostbite injuries.  Regarding the victim's discoloration, we acknowledge the conflicting proof regarding whether it was caused by blunt force trauma, the victim's medication, or frostbite.  In the light most favorable to the State, though, the proof shows that the victim was assaulted.  Before his death, the victim told Chief Moses that he had been in an altercation with [Petitioner] and Mr. Bryson and that both kicked him while he was on the ground.  [Petitioner] implicated herself to Ms. Lewis, stating, "Girl, we beat him down."  [Petitioner] is not entitled to relief on this basis.

*Greene I*, at *31–32.

In the instant case, Petitioner supports her claim that the evidence was insufficient to support her convictions by asserting that the prosecution relied upon only "hearsay testimony," "some physical evidence from the scene, medical expert testimony[,] and circumstantial evidence to establish [her] guilt."  (ECF No. 14 at PageID 91.)  Petitioner further notes that (1) the victim could have caused his own injuries by falling over the broken bench in his yard, as the medical examiner testified that the victim had issues with tremors and balance; (2) Dr. Wright testified that hypothermia, rather than assault, caused the victim's bruising; and (3) her attorney did not argue

45

or introduce evidence "that [the victim] had severe breathing problems" that prevented him from being able to get up off of the ground and go into the house. (*Id.*)

While Petitioner challenges the prosecution's reliance on certain evidence to convict her, however, the TCCA correctly pointed out that the evidence on which the prosecution relied included, among other things, (1) statements from the victim indicating that both Petitioner and Mr. Bryson assaulted him before leaving him on the ground in his yard for one to two November nights after he refused to let them take his car;[2] (2) testimony from two people indicating that Petitioner had confessed to them that she participated in beating the victim; (3) testimony about the scene where police found the victim; (4) testimony from the medical examiner indicating that a substantial portion of the victim's injuries came from blunt force trauma as well as hypothermia/frostbite (*see*, *e.g.*, ECF No. 18-6 at PageID 758–74); and (5) testimony that the victim's car was worth more than $1,000 and less than $10,000. *Greene I*, at *31–32. Based on this evidence, it was reasonable for the jury to find that (1) Petitioner committed aggravated assault by intentionally causing significant injuries to the victim; (2) Petitioner committed theft in violation of Tenn. Code Ann. § 39–14–103 by taking the victim's car, which worth more than $1,000 and less than $10,000, without the victim's permission; and (3) Petitioner committed first-degree felony murder because the victim died as a result of actions she took during her theft of the victim's car.

Petitioner specifically points out that the jury could have construed some of the evidence presented at trial to find that the victim caused his own injuries by falling on or around the broken

---

[2] To the extent Petitioner seeks to challenge the admission of the victim's statements as hearsay and asserts that her counsel should have emphasized that the victim's breathing issues kept him from being able to get up off of the ground and into his house with this claim, the Court will separately deny those claims below and therefore examines the sufficiency of all the evidence presented at trial.

46

bench, and she therefore was not guilty of some of the crimes with which she was charged. But this does not mean that the evidence was insufficient to support her convictions. As set forth above, at this stage the Court must view the evidence in the light most favorable to the prosecution. *Jackson*, 443 U.S. at 319. This Court also cannot reweigh evidence, reevaluate witness credibility, or otherwise disregard a jury's decision. *Brown*, 567 F.3d at 205. Moreover, the jury's guilty verdict demonstrates that the jury did not interpret the evidence to establish that the victim injured himself but instead interpreted the evidence to establish Petitioner's guilt. Viewed in the light most favorable to the prosecution, sufficient evidence supports this reasonable jury finding, and this Court therefore will not disturb it.

Accordingly, the TCCA properly applied *Jackson* to determine that the evidence was sufficient to support Petitioner's convictions under Tennessee law. Petitioner has not met her heavy burden to establish that the TCCA's denial of her claim challenging the sufficiency of the evidence to support her convictions was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, and she is not entitled to habeas corpus relief for this claim.

## B. Admission of Victim's Statement

Petitioner next challenges the trial court's admission of the victim's last statement to Larry Moses. (ECF No. 14 at PageID 92–93.)[3] Petitioner presented a claim challenging the admission of this statement to the TCCA in her direct appeal. (ECF No. 18-13 at PageID 1826–46.) The

---

[3] While Petitioner refers to multiple statements from the victim in her heading for this claim (ECF No. 14 at PageID 92), she only refers to the last statement from the victim, which Mr. Moses tried but failed to record, in the section of her petition containing facts to support this heading (*id.* at PageID 93). Thus, the Court will address only this last statement from the victim. Additionally, in the portion of her petition designated for Petitioner to set forth the facts supporting this claim, Petitioner mainly argues that her counsel was ineffective with regard to Cynthia Lewis's testimony. (*Id.* at PageID 92–93.) The Court will address this claim separately below.

47

TCCA denied this claim by finding that the statement was a dying declaration and therefore fit within an exception to Tennessee's evidence rule against admission of hearsay. *Greene I*, at *32–33.

Petitioner asserts that the trial court erred in admitting the victim's last statement to Mr. Moses because the statement "should be taken as [hearsay]." (ECF No. 14 at PageID 93.) Petitioner's claim challenging the trial court's admission of the victim's last statement to Mr. Moses in her direct appeal to the TCCA likewise did not assert that the admission of this evidence violated the Constitution. (ECF No. 18-13 at PageID 1826–46.) Thus, it appears that Petitioner asserts in her § 2254 petition, as she did in her direct appeal to the TCCA, that the trial court violated state evidentiary law by admitting the victim's last statement to police. This claim, however, is not cognizable under § 2254. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (holding "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Sinistaj v. Burt*, 66 F.3d 804, 807 (6th Cir. 1995) ("Errors of state law alone cannot form the basis of relief under federal *habeas corpus*.").

Moreover, to the extent that, in her § 2254 petition, Petitioner asserts that admission of this statement violated her constitutional rights, she did not raise this claim under this theory to the TCCA. As such, she procedurally defaulted it, even if she presented the state courts with facts sufficient to assert such a claim. *Gray*, 518 U.S. at 162–63 (holding that a petitioner cannot exhaust a federal claim "by presenting the state courts only with the facts necessary to state a claim for relief"); *Wagner v. Smith*, 581 F.3d 410, 414, 418 (6th Cir. 2009) (noting that exhaustion requires the petitioner to "fairly present" each federal claim to all levels of the state appellate system by presenting the "same claim under the same theory" up to the state's highest court) (citations omitted)). Petitioner has not set forth any reason for the Court to excuse that default.

48

Accordingly, the Court will not address this claim on the merits, and Petitioner is not entitled to § 2254 relief for this claim.

### C. Ineffective Assistance of Counsel

In her § 2254 petition, Petitioner asserts that her trial counsel was ineffective for:

(1)     Failing to argue to the jury that the victim could not get up off the ground and into his house because of breathing problems;

(2)     Failing to present her sister as a witness to challenge Cynthia Lewis's credibility;

(3)     Failing to have sufficient interaction with her about a strategy for her defense, and therefore leaving her "a bystander to her own defense";

(4)     Never explaining why the waiver of a preliminary hearing was in her best interests and/or the strategy behind such a waiver;

(6)     Having a conflict of interest based on his representation of "several potential witnesses" and witness Cynthia Lewis;

(7)     Failing sufficiently prepare her to testify; and

(8)     Failing to ask her whether she committed the crimes with which she was charged.

(ECF No. 14 at PageID 91, 93–97.)  The Court will address each of these claims in turn, after setting forth the applicable standard of review.

### i. Standard of Review

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for h[er] defense."  U.S. Const. Amend. VI.  This includes the right to "reasonably effective assistance" of counsel.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the

> defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. A petitioner has the burden of proving ineffective assistance of her counsel. *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A party asserting an ineffective-assistance-of-counsel claim must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires a claimant to show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

The Supreme Court has emphasized that a claimant must establish both prongs of a claim of ineffective assistance of counsel to meet her burden, and if either prong is not satisfied, the claim must be rejected. *Id.* at 687. Moreover, a habeas petitioner alleging ineffective assistance of counsel bears a heavy burden, given the "doubly deferential" review of a such a claim under § 2254(d)(1). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### ii. Breathing Problems

50

Petitioner first claims that her trial counsel failed to argue and/or present evidence that the victim had breathing problems that were "another complication" that prevented him from being able to get up off the ground and go into his house. (ECF No. 14 at PageID 91.) However, Petitioner did not present such a claim to the TCCA in her appeal of the denial of her petition for post-conviction relief (ECF No. 18-23), and she therefore procedurally defaulted it. Petitioner also has not alleged or established that the ineffective assistance of her post-conviction counsel caused her default of this claim, such that the Court could review it on the merits. *Hugueley v. Mays*, 964 F.3d 489, 498–99 (6th Cir. 2020) (providing that a petitioner relying on the procedural default exception for claims defaulted due to the ineffective assistance of counsel announced in *Martinez* "must still demonstrate that the ineffectiveness of his post-conviction counsel was the 'cause' of [her] default") (quoting *Trevino*, 569 U.S. at 423).

Moreover, even if the Court could review the merits of this claim under *Martinez*, Petitioner would not be entitled to relief. As the TCCA noted, Petitioner's trial counsel repeatedly explained at the post-conviction hearing that the defense theory at trial was that the victim had injured himself. *Greene II*, at *7. Thus, the issue at the heart of Petitioner's defense was not the reason the victim could not get off the ground and safely back into his house—which the evidence at trial suggested various issues, including the victim's mobility problems, injuries, and/or breathing problems, could explain—but rather what had caused the victim to be lying in the yard in the first place. Accordingly, evidence of the victim's breathing problems would not have advanced the defense's case theory, and the record does not suggest that introduction of evidence of such breathing problems would have changed the result of Petitioner's trial in any way.

As such, Petitioner cannot establish that her trial counsel was deficient with regard to presenting evidence of the victim's breathing problems, or that the lack of any such evidence prejudiced her, and she is not entitled to relief under § 2254 for this claim.

### iii. Cynthia Lewis

Petitioner next asserts that trial counsel was ineffective for not presenting her sister as a witness to undermine Cynthia Lewis's credibility. (ECF No. 14 at PageID 92–93, 95–96.) The TCCA denied this claim on the ground that Petitioner had not presented her sister as a witness at the post-conviction hearing. *Greene II*, at *11. Petitioner has not established that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, nor does the record reflect as much. *See, e.g., Stewart v. Wolfenbarger*, 468 F.3d 338, 353 (6th Cir. 2006) (finding that the state courts' refusal to consider an ineffective assistance of counsel claim based on counsel's failure to call a witness because the petitioner had failed to present admissible evidence of what a witness's testimony would have been if he testified "was not contrary to or an unreasonable application of clearly established law").

Thus, Petitioner is not entitled to relief under § 2254 for this claim.

### iv. Trial Counsel Interactions with Petitioner

Petitioner next claims that her appellate counsel was ineffective because he failed to discuss defense strategy with her and have sufficient interactions with her, and instead left her "a bystander to her own defense." (ECF No. 14 at PageID 94–95.) The TCCA denied this claim by stating as follows:

> The post-conviction court accredited trial counsel's testimony that he met with the Petitioner for "significant periods of time on at least five occasions during the pendency of [the] Petitioner's case." The post-conviction court also found that trial counsel had a "strong understanding" of the facts of the Petitioner's case and

52

that he "spent a good amount of time over and above his meetings with [her] learning about the facts and interviewing and preparing both for cross examination of the State's witnesses and for [the defense's] witnesses." The evidence does not preponderate against these findings. The Petitioner is not entitled to relief in this regard.

*Greene II*, at *10. The evidence presented at the post-conviction hearing supports the TCCA's denial of this claim. Moreover, Petitioner has not presented evidence suggesting that there is a reasonable probability that any additional interactions between her and her counsel would have affected the result of her trial, nor does the record suggest as much.

Thus, Petitioner has not established that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, and she is not entitled to habeas corpus relief for this claim.

### v. Waiver of Preliminary Hearing

Petitioner also appears to claim that her counsel was ineffective for waiving her preliminary hearing and not explaining or discussing the advantages and disadvantages of doing so with her. (ECF No. 14 at PageID 95.) Again, however, Petitioner did not present such a claim to the TCCA (*see* ECF No. 18-23), and she therefore procedurally defaulted it. Petitioner also has not asserted that the ineffective assistance of her post-conviction counsel caused her default of this claim, such that the Court could review it on the merits. *Hugueley*, 964 F.3d at 498–99.

Moreover, even if the Court could review the merits of this claim under *Martinez*, Petitioner's trial counsel explained at the post-conviction hearing that he decided to waive the preliminary hearing because the prosecutor had agreed to give him early discovery, including what was then believed to be a videotape of the dying declaration of the victim, in exchange for that waiver, and this occurred while the prosecutor had extended a plea offer to Petitioner for a charge of aggravated assault. (ECF No. 18-20 at PageID 2225, 2229–30.) Accordingly, it does not appear

53

that this was deficient performance, and Petitioner has not pointed to any evidence in the record suggesting that this decision prejudiced her, nor does the record suggest that it did.

Thus, Petitioner is not entitled to relief under § 2254 for this claim.

### vi. Conflict of Interest

Petitioner next claims that her counsel was ineffective because he had a conflict of interest due to his formerly representing "several of the [prosecution's] potential witnesses against her." (ECF No. 14 at PageID 95.) In denying this claim, the TCCA cited *Strickland* and various state court cases before stating as follows:

> The post-conviction court accredited trial counsel's testimony that the only potential conflict of interest existed with Millsaps, that trial counsel's representation of Millsaps occurred "a significant period of time from when [trial counsel] represented [the Petitioner]" in a case unrelated to the Petitioner's case, and that trial counsel had discussed the representation with the Petitioner. The post-conviction court found that "this conflict only prejudiced Millsaps," and that the potential conflict did not affect trial counsel's representation of the Petitioner. The post-conviction court also found that Millsaps' testimony was "helpful . . . in that she [provided] a time line"; therefore, the Petitioner suffered no prejudice. We agree. The Petitioner is not entitled to relief.

*Greene II*, at *16.

Again, the TCCA properly found that Petitioner is not entitled to relief. With regard to ineffective assistance of counsel claims based on a conflict of interest, "to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Id*. at 350. The record establishes that Petitioner's trial counsel did not actively represent different interests at Petitioner's trial. While Petitioner's trial counsel had previously

represented Ms. Millsaps, that representation occurred a substantial amount of time prior to Petitioner's trial in a matter unrelated to Petitioner's trial. Moreover, nothing in the record suggests that this prior representation negatively affected Petitioner's trial counsel's performance in her trial.

As such, Petitioner has not established that her counsel had a conflict of interest, or that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. Thus, she is not entitled to relief under § 2254 for this claim.

### vii. Testimony Preparation

As set forth above, Petitioner also claims that her counsel was ineffective for not adequately preparing her to testify at her trial. (ECF No. 14 at PageID 96.) Petitioner specifically alleges that trial counsel made the decision that Petitioner should testify "minutes before she took the stand" and that, despite her counsel telling her that he would prepare her for trial through both a mock direct and cross examination, he did not do so, and never told her what questions to expect from him or the prosecutor. (*Id.*)

The TCCA rejected this claim by relying on Petitioner's trial counsel's testimony at the post-conviction hearing that Petitioner was prepared to testify at trial, which the post-conviction court expressly credited, as well as trial counsel's testimony that "it was not unusual to wait until the State's proof was concluded" to decide whether the defendant would testify. *Greene II*, at *11. The record supports the TCCA's rejection of this claim, as the post-conviction court specifically credited Petitioner's trial counsel's testimony "that he spent hours preparing Petitioner to testify, both on direct and on cross-examination," noted that the decision of whether an accused should testify is often made after conclusion of the prosecution's proof, and pointed out that the record

55

established that Petitioner had willingly made the decision to waive her right to remain silent because she wanted to testify.  (ECF No. 18-19 at PageID 2091.)  Again, this Court cannot second-guess credibility determinations or reweigh evidence, and the record supports the post-conviction court's factual findings regarding this claim.  (ECF No. 18-20 at PageID 2128, 2182–83, 86; ECF No.18-21 at PageID 2264–67, 2271–73, 2308–15.)

Thus, Petitioner has not established that her counsel was deficient in preparing her to testify, or that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, and she is not entitled to relief under § 2254 for this claim.

### viii.  Failing to Allow Petitioner to Declare Her Innocence

Petitioner also claims that her counsel was ineffective for not questioning her in a way that allowed her to declare her innocence to the jury.  (ECF No. 14 at PageID 96–97.)  Petitioner presented this claim to the TCCA, which denied it by noting that the post-conviction court had determined that "'the only conclusion that can be drawn from all of [the Petitioner's] testimony is, that [the Petitioner] did not kill that man'" and "the Petitioner was given an opportunity to tell the jury her 'side of the case.'"  *Greene II*, at *11.

The post-conviction court accurately determined that while Petitioner's trial counsel did not specifically ask her whether she was guilty of the charges against her, he asked her a number of questions about the events surrounding the attack on the victim, which she answered in a manner that made it abundantly clear that she was asserting that she had not assaulted the victim in the manner that led to his death.  Specifically, throughout her direct examination, Petitioner's counsel repeatedly asked Petitioner about her activities during the time period relevant to the attack on the victim and the victim being found.  (*See*, *e.g.*, ECF No. 18-7 at PageID 945–51.)  Also, as

56

Respondent points out, Petitioner's trial counsel also asked her specific questions that allowed her to (1) state that the last time she spoke to the victim was around 2:30 on the Saturday afternoon before he was found; (2) deny that she had ever argued with the victim about use of his car; (3) deny that she, Mr. Bryson, and the victim had ever scuffled at the broken bench; (4) deny that she had ever driven the victim's vehicle while it dragged the victim or struck him; (5) deny that she or Mr. Bryson had thrown orange soda at the victim; and (6) deny that she had ever been physical with the victim or had ever assaulted or threatened to injure the victim. (*Id.* at PageID 951, 963–64, 975–76.) Thus, the record establishes that Petitioner's trial counsel effectively asked her questions that allowed her to assert to the jury that she had not caused the victim's injuries that led to his death.

Accordingly, Petitioner has not established that her counsel was deficient in questioning her at trial, or that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, and she is not entitled to relief under § 2254 for this claim.

IV.     **CONCLUSION**

For the reasons set forth above, Petitioner's requests for § 2254 relief is **DENIED**, and this action is hereby **DISMISSED**.

V.      **APPELLATE ISSUES**

The Court must now consider whether to issue a certificate of appealability ("COA") should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas corpus proceeding only if he is issued a COA, and a COA may issue only where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis

without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right and thus a COA should issue. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484.

Reasonable jurists would not debate the Court's finding that Petitioner procedurally defaulted any claim that the trial court violated her constitutional rights by admitting the victim's dying declaration and her unexhausted ineffective assistance of counsel claims. Further, reasonable jurists could not conclude that Petitioner has made a substantial showing of a denial of a constitutional right with regard to her claim challenging the sufficiency of the evidence or her exhausted ineffective assistance of counsel claims, such that they would be adequate to deserve further review. Accordingly, a certificate of appealability is **DENIED**.

To the extent Petitioner may apply to proceed on appeal *in forma pauperis*, the Court **CERTIFIES**, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this action would not be taken in good faith and would be totally frivolous. The Court therefore **DENIES** leave to appeal *in forma pauperis*. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman*, 117 F.3d 949, 952 (6th Cir. 1997).

**IT IS SO ORDERED**, this 8th day of July 2022.

/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE

58